MICHAEL ANDREWS        \*

2075 Tanglewood Drive

Waldorf, Maryland 20601     \*    IN THE

and                      \*    CIRCUIT COURT FOR

JOHN FISHBACK         \*    HOWARD COUNTY

30420 Revells Neck Road

Westover, Maryland 21890    \*

        Plaintiffs       \*     Case No.: C-13-CV-22-000893

v.                       \*

MARYLAND DEPARTMENT OF PUBLIC \*
SAFETY AND CORRECTIONAL SERVICES

                                   \*
AND

                                   \*

ROBERT L. GREEN
WAYNE HILL
ANNIE D. HARVEY
CAROLYN SCRUGGS
JAMA ACUFF            \*
CASEY CAMPBELL

                                   \*

        SERVE ON:
        Michael O. Doyle, Assistant Attorney General
        Deputy Counsel            \*
        Office of the Attorney General
        Department of Public Safety and     \*
         Correctional Services
        200 Saint Paul Place          \*
        Baltimore, Maryland  21202

                                   \*

        Defendants

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs John Fishback and Michael Andrews ("Plaintiffs"), through their undersigned

counsel, hereby file this Complaint and Demand for Jury Trial against Defendants Maryland

Department of Public Safety and Correctional Services, O. Wayne Hill, Jama Acuff, and Casey

Campbell (collectively the "Defendants"), and state in support:

## INTRODUCTION

The Maryland Department of Public Safety and Correctional Services ("DPSCS") consistently violates the laws protecting prisoners with disabilities and perceived disabilities. These ongoing violations exclude Maryland prisoners from numerous DPSCS programs, services, and activities, and cause them to suffer the humiliation, indignity, inhumanity, and difficulties that accompany such exclusion.  These violations are particularly harsh for prisoners who suffer from serious mental illness ("SMI").  Plaintiffs bring this action to redress DPSCS's widespread pattern and practice of statutory and constitutional violations against prisoners with disabilities.

## PRELIMINARY STATEMENT

1.      Plaintiffs bring this action to challenge the acts and omissions of DPSCS and its agents and employees, for: (1) discriminating against them because they are disabled and/or because of a perceived disability; (2) failing to properly make available and administer the administrative grievance process; (3) subjecting Plaintiffs to conditions of confinement that have caused, and continue to create a substantial risk of harm; and (4) depriving Plaintiffs of the right to equally participate in and benefit from DPSCS programs, services, and activities.

2.      The Eighth and Fourteenth Amendments to the United States Constitution along with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794, require Defendants to (1) provide the necessary and reasonable modifications and ancillary aids and services that would allow Plaintiffs to freely and safely access facilities, and (2) ensure that qualified prisoners with disabilities have the right to equally participate in and benefit from prison programs, services, and activities.

## INTRODUCTION

1.      DPSCS has a long and illustrious history of depriving prisoners of their basic human rights.  Sadly, this is especially true for prisoners with an actual or perceived disability.

These abuses range from failures to accommodate wheelchair-bound prisoners to failures to provide adequate medical care to prisoners with serious mental illnesses.

2.      As demonstrated herein, even after DPSCS repeatedly admitted to violating the Plaintiffs' rights, DPSCS still refused to offer any remedy to the Plaintiffs.  Instead, DPSCS either admitted fault and then did nothing, or DPSCS promised to change its policies but never did.

3.      Troublingly, DPSCS sidesteps its responsibilities altogether when it comes to providing adequate medical care to prisoners.  As demonstrated herein, DPSCS routinely disclaims all liability for inadequate medical treatment claims and tells prisoners that they do not have a remedy for these violations.  According to DPSCS, it can delegate to for-profit contract vendors its duty to provide adequate medical care to prisoners without recourse.  This is certainly wrong.

4.      Here, DPSCS engaged in a pattern of deprivation across multiple institutions that spanned several years, which included failing to (a) provide prescription mental health medications; (b) honor medical orders that existed for nearly two decades regarding the appropriate use of handcuffs; (c) provide wheelchairs; (d) provide handicap-accessible transportation; (e) provide wheelchair-accessible facilities; (f) schedule and transport prisoners to medical appointments with providers and facilities in the community; and (g) provide life-preserving healthcare even after being specifically ordered to do so.

5.      DPSCS also placed a prisoner with serious mental health diagnoses in long-term solitary confinement without any justification or meaningful review.  Then, DPSCS compounded the punishment by foreclosing the ability for mental health therapy, services, programming, and treatment for more than one year.

6.      This case not only highlights the continuing harm that DPSCS imposes on Maryland prisoners without justification, but it also underscores the lack of any available remedy for those prisoners.  Indeed, this case presents at least seven separate grievances for which DPSCS

admitted fault but offered no remedy and instead dismissed the meritorious grievances anyway. Thus, the DPSCS administrative remedy scheme is designed to give the appearance of meaningful redress, but it really offers nothing more than lip service to valid prisoner claims. This absence of meaningful redress allows DPSCS to violate rights with impunity and with no incentive to change its practices.

7.     DPSCS and the State of Maryland are keenly aware of the issues and injuries described herein, together with the circumstances giving rise to those issues and injuries.

8.     Defendants have harmed and continue to harm Plaintiffs by failing to make the necessary and reasonable accommodations and modifications, and by failing to provide ancillary aids and services that would allow Plaintiffs to freely and safely access DPSCS facilities, services, and programs. As a result, Plaintiffs are exposed to a substantial risk of injury daily. Indeed, the Plaintiffs have sustained personal injuries because of the Defendants' repeated failures to provide necessary and reasonable accommodations.   Further, these ongoing failures embarrass, dehumanize, and degrade Plaintiffs.

9.     Defendants have also harmed and continue to harm Plaintiffs by not affording them an opportunity to equal enjoyment of the benefits and opportunities available to the non-disabled prisoner population. For example, Plaintiffs are unable to participate in valuable activities, like recreation and mental health counseling, solely because of their disabilities.

10.     Moreover, Defendants discriminate against Plaintiffs because of Plaintiffs' disabilities in the administration of various work programs, job training, and other ancillary benefits that allow non-disabled prisoners to receive vocational training, earn wages, and obtain credits towards their release. As a result, the Plaintiffs are at a substantial financial and educational disadvantage, both during their respective terms of confinement and upon release, when compared to their non-disabled counterparts.

11.     Defendants have also denied Plaintiffs their due process rights.  Defendants have failed to establish minimum mandatory standards for administrative complaints and grievances as required by Md. Code, CORR. SERVS. ("CS") § 8-103, and Md. Code Regs. 12.14.04.05, violating the Plaintiffs' Fourteenth Amendment rights to access the courts.

12.     For these violations, Plaintiffs seek compensatory and punitive damages, attorneys' fees and costs, and any other available relief.

**PARTIES**

13.     Plaintiff Michael Andrews is a Maryland resident who was formerly a prisoner committed to the custody of the DPSCS and resided at the Dorsey Run Correctional Facility ("DRCF").  Mr. Andrews, a single-leg amputee, is a wheelchair-bound individual and is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).

14.     Plaintiff John Fishback is and was at all relevant times a prisoner committed to the custody of DPSCS.  Mr. Fishback suffers from bipolar disorder and chronic pain, which makes him a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).  During his incarceration with DPSCS, Mr. Fishback has been housed at several DPSCS facilities, and he currently resides at the Eastern Correctional Institution ("ECI").

15.     Plaintiff Fishback has exhausted his available administrative remedies, and proof of his exhaustion efforts is attached as **EXHIBIT 1**.

16.     Defendant DPSCS is a public entity organized under the laws of Maryland and is a principal department of the State of Maryland pursuant to CS § 2-101.  The Maryland Division of Corrections ("DOC") is a unit of DPSCS that is organized to incarcerate certain criminal defendants sentenced by Maryland courts.  *See* CS § 2-201.  The DOC is tasked with operating and overseeing Maryland's twenty-four (24) state prison facilities.  DPSCS is a public entity for purposes of the Americans with Disabilities Act. DPSCS receives federal financial assistance to

administer a program or activity. Based on the knowledge of its officials, DPSCS is aware of, has failed to remedy, and is deliberately indifferent to the conditions of confinement for individuals with serious mental illness, and individuals with actual or perceived disabilities, which place them at harm and substantial risk of serious harm.

17.     Defendant Robert L. Green is the Secretary of DPSCS. The DPSCS Secretary is the primary administrator of the Department and is responsible to the Governor. CS § 2-102. Defendant Green is aware of DPSCS's policies and practices regarding disabled prisoners, and he is also knowledgeable of the requirements of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to treatment of individuals incarcerated within DPSCS. He is aware of, has failed to remedy, and is deliberately indifferent to the conditions of segregation for individuals with serious mental illness, which place them at harm and substantial risk of serious harm. Defendant Green is sued in his official capacity.

18.     Defendant Wayne Hill is the Deputy Secretary of Operations for DPSCS. He is responsible for DPSCS' Division of Corrections, the administrative unit responsible for correctional operations at every Maryland state correctional facility. He has the power to review or deny case management recommendations, including requests for disciplinary and administrative segregation. He is aware of, has failed to remedy, and is deliberately indifferent to the conditions of segregation for individuals with serious mental illness, which present harm or substantial risks of serious harm for such individuals. He is sued in his official capacity.

19.     Defendant Annie D. Harvey is the Commissioner of Correction for DPSCS (the "Commissioner"). The Commissioner is responsible for the administration of DPSCS and answers to the Secretary of DPSCS and the Governor for the supervision of prisoners and correctional staff. CS §§ 3-203 *et seq.* The Commissioner's responsibilities also include responding to appeals of

complaints and grievances brought by individuals in DPSCS custody.   As Commissioner, Defendant Harvey is aware of DPSCS and DOC policies and practices regarding prisoners, including policies and practices regarding wheelchair-bound prisoners and those with other disabilities.  The Commissioner is also aware of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated within DPSCS.  Defendant Harvey is sued in her official capacity.

20.    Defendant Carolyn Scruggs is the Assistant Secretary of Programs, Treatment, and Re-Entry for DPSCS. She is responsible for DPSCS' programs and services intended to prepare incarcerated individuals to return to their communities. She is aware of, has failed to remedy, and is deliberately indifferent to the conditions of segregation for individuals with serious mental illness, which place them at harm and substantial risk of serious harm. She is sued in her official capacity.

21.    On information and belief, Defendant Jama Acuff was the warden of DRCF at all relevant times and was responsible for the governance, discipline, and policies of that institution. CS § 3-211.  In addition, Warden Acuff is responsible for the enforcement of DPSCS regulations and directives.  Warden Acuff is the legal custodian of all individuals incarcerated at DRCF and is responsible for their safe, secure, and humane treatment.  Warden Acuff is aware of DPSCS's policies and practices regarding prisoners, including policies and practices regarding wheelchair-bound prisoners and those with other disabilities or perceived disabilities.  Warden Acuff is also aware of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated at DRCF.  Warden Acuff is aware of the complaints brought by wheelchair-bound prisoners and prisoners with other disabilities at DRCF regarding failure to properly establish and or follow

proper administrative grievance procedures, as well as Plaintiffs' complaints regarding safety concerns at DRCF's inadequate facilities and inaccessible programming.  Defendant Acuff is named in this action in her individual and official capacities.

22.     On information and belief, Defendant Casey Campbell is the former warden at DRCF and RCI.  In that role, Mr. Campbell was responsible for the governance, discipline, and policies of those institutions.  CS § 3-211.  In addition, Mr. Campbell was responsible for the enforcement of DPSCS regulations and directives.  As warden, Mr. Campbell was the legal custodian of all individuals incarcerated at his institutions and was responsible for their safe, secure, and humane treatment.  As warden, Mr. Campbell was aware of DPSCS's policies and practices regarding prisoners, including policies and practices regarding wheelchair-bound prisoners and those with other disabilities or perceived disabilities.  As warden, Mr. Campbell was also aware of federal law, including the Eighth and Fourteenth Amendments to the United States Constitution, the ADA, and Section 504 as they pertain to the treatment of individuals incarcerated within DPSCS.  As warden, Mr. Campbell was aware of the complaints brought by wheelchair-bound prisoners and prisoners with other disabilities at DRCF and RCI regarding failure to properly establish and or follow proper administrative grievance procedures, as well as Plaintiffs' complaints regarding safety and accommodation concerns at RCI and DRCF's inadequate facilities and inaccessible programming.  Defendant Campbell is named in this action in his individual and official capacities.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the above-captioned Defendants, pursuant to Maryland Code, COURTS & JUDICIAL PROCEEDINGS ("CJP"), §§ 6-102 and 6-103, as through their acts, Defendants caused the tortious and constitutional injuries herein described in the State of Maryland, and because they transact business in the State of Maryland, contract to perform

services in the State of Maryland, and through their acts and the acts of their agents, caused the tortious and constitutional injuries herein described.

24.     Venue is proper in Howard County, pursuant to CJP § 6-201 as Defendant DPSCS carries on regular business therein, and because part of the harms alleged herein arose therein.

25.     This Court has subject matter jurisdiction over this matter, pursuant to CJP §§ 1-504 and 4-401, as the amount in controversy exceeds Thirty Thousand Dollars ($30,000.00).

## STATEMENT OF FACTS

### DPSCS' Systemic Violations of Laws Protecting People With Disabilities

26.     DPSCS systematically violates the laws protecting persons with disabilities and perceived disabilities in its custody.  This includes but is not limited to prisoners who are blind, deaf, hard of hearing, and have mobility impairments.  This also extends to prisoners whom DPSCS perceives as disabled but are not.  DPSCS has violated and continues to violate the ADA, Rehabilitation Act, Eighth Amendment, Due Process Clause, and the Maryland Declaration of Rights in the following ways, which are non-exhaustive:

a. Failure to maintain wheelchair-accessible facilities;

b. Failure to provide and maintain wheelchairs and assistants ("pushers");

c. Failure to allow and maintain prosthetic devices;

d. Exclusion from jobs and programs;

e. Engaging in retaliation and interference against prisoners who are disabled and/or who file grievances about noncompliant DPSCS activities;

f. Refusing to answer meritorious grievances and complaints;

g. Refusing to modify practices even with meritorious grievances;

h. Failure to train personnel and private contractors on the requirements of federal disability laws;

i.  Failure to properly assign prisoners to jobs, programs, and other services based on their commitment status and security level; and

j.  Failure to provide adequate medical treatment, follow-up care, and devices to prisoners with disabilities;

k.  Failure to provide mental health counseling or programming;

l.  Failure to provide necessary prescription medications;

m.  Failure to engage competent medical service providers to oversee and administer the healthcare needs of prisoners committed to the custody of DPSCS;

n.  Failure to provide ADA-compliant housing accommodations with proper prisoner-to-bed and prisoner-to-bathroom ratios; and

o.  Failure to provide safe and habitable living environments for disabled individuals by overcrowding housing facilities, improperly ventilating and cooling its housing units, and by failing to keep the housing units free from hazards that interfere with disabled prisoners' abilities to safely move about the institution.

27.  The Defendants know that the Plaintiffs are qualified individuals with disabilities.

28.  Defendants have excluded Plaintiffs, because of their disability, from participation or have been denied the benefits of DPSCS services, programs, or activities, or have been subjected to discrimination by DPSCS.

29.  The events described herein are not isolated incidents; they are but some examples of DPSCS's failure to comply with the laws protecting individuals with disabilities.

### *Michael Andrews*

30.  Mr. Andrews was incarcerated at DRCF between 2019 and 2021.  Mr. Andrews is a diabetic single-leg amputee (as of September 2019) and requires prosthetics or other assistive

devices to ambulate.  This physical impairment substantially limits one or more major life activities, including but not limited to walking.

31.     Before his incarceration, Mr. Andrews managed his diabetes without issue.

32.     Upon his commitment to DPSCS in January 2019, Mr. Andrews still had both of his legs but was wheelchair-dependent because of a left foot ulcer.  Mr. Andrews arrived at DRCF with medical orders for a wheelchair because he was not supposed to walk on his ulcerated foot. However, DPSCS refused to provide a wheelchair to Mr. Andrews and gave him a cane instead, thus ignoring the standing medical orders.

33.     DPSCS's refusal to provide a wheelchair to Mr. Andrews was just the beginning of a nearly three-year period of continuing violations and harm, which only ended after Mr. Andrews was released.

34.     Rather than providing a wheelchair to Mr. Andrews, DPSCS made him walk great distances several times a day on his ulcerated foot to get his food and medication.

35.      By April 2019, Mr. Andrews' left foot had become seriously infected because he was forced to walk on it every day, despite medical orders to the contrary.  The infection became so severe that Mr. Andrews underwent a left fifth toe amputation.

36.     Mr. Andrews was supposed to have a wheelchair when he returned to DRCF after the amputation surgery.  However, while DPSCS initially provided a wheelchair to him, DPSCS took the wheelchair away on May 1, 2019, and gave Mr. Andrews a walking boot instead.

37.     From January to May 2019, DPSCS did not provide Mr. Andrews with a medically appropriate diet for his diabetes.

38.     By the end of June 2019, Mr. Andrews's kidneys began to fail because of the continuing infection in his left lower extremity that could not heal because he was forced to walk on it every day and because of the improper diet.

39.     By August 2019, Mr. Andrews' left lower extremity had become so infected that it was oozing with a green odorous discharge, it caused severe and intractable pain, and doctors diagnosed osteomyelitis.

40.     On September 3, 2019, Mr. Andrews underwent a left below-the-knee amputation.

41.     Mr. Andrews was discharged from his amputation surgery back to DRCF with medical orders for a wheelchair and for a prosthetic once his surgical wound had healed.

42.     However, DPSCS refused to provide a wheelchair to Mr. Andrews for at least one week.  Mr. Andrews filed a grievance with DRCF about this issue, which DPSCS and Defendant Acuff found to be meritorious.  DPSCS admitted that it had failed to provide Mr. Andrews with a wheelchair from April 21, 2019 through the second week of September 2019.

43.     Even after DPSCS finally provided a wheelchair to Mr. Andrews, DPSCS continued its pattern of failing to accommodate Mr. Andrews' disability.

44.     In the fall of 2019, DPSCS transported Mr. Andrews (in his wheelchair) to a medical appointment in a van that was not wheelchair accessible.  Not only was the van noncompliant, but the correctional officers also failed to properly secure Mr. Andrews' wheelchair inside the van.  Unsurprisingly, when the van made a turn along the route, Mr. Andrews' wheelchair flipped over and caused injuries.  Mr. Andrews filed a grievance in connection with this incident, which DPSCS and Defendant Acuff found to be meritorious.  Yet, in the same breath as admitting to placing Mr. Andrews in a non-compliant vehicle, Defendant Acuff disclaimed any responsibility for what happened.  Defendant Acuff even accused Mr. Andrews of making an unsubstantiated injury claim, when the record clearly showed that Mr. Andrews received treatment at DRCF for his injuries.

45.      Throughout the fall and winter of 2019, Mr. Andrews experienced the same challenges that every other wheelchair-bound prisoner at DRCF has faced with even the most basic

activities of daily living.  DRCF is not wheelchair accessible, despite DPSCS's claims to the contrary.  The insufficient and non-ADA-compliant accommodations include: (a) no shower hose, grab rails, or adjustable seats in DRCF's shower facilities; (b) the designated handicapped toilet was not the appropriate height; (c) the handicapped housing unit did not have enough space between the beds for wheelchair-bound prisoners to safely navigate; (d) doorways were not cut wide enough to safely allow wheelchair access; (e) the exercise area was on a slope and contained loose flat rocks making wheelchair access impossible; (f) the tables in the dining and visiting rooms were too low and not handicap accessible; (g) the handicap housing unit contained many more wheelchair-bound prisoners than its design safely allowed; and (h) there was only one handicap accessible bathroom for approximately sixty prisoners, both handicapped and otherwise.

46.    Moreover, the DPSCS-provided wheelchair routinely broke and needed maintenance.  For example, the hardware that secured the brakes to the wheelchair came loose and made slowing or stopping the wheelchair very difficult.  Mr. Andrews could not tighten the hardware on his own, which made traveling in the wheelchair hazardous.  DRCF also failed to provide Mr. Andrews with a "pusher," a prisoner designated to assist and push a wheelchair-bound prisoner.  Mr. Andrews advised DRCF about these issues, but no one responded to his concerns.  Mr. Andrews also asked for a replacement wheelchair after he saw spare wheelchairs in the day room, but no one responded to his request.

47.    Mr. Andrews filed grievances about the insufficient and degrading conditions at DRCF and advised DPSCS and Defendant Acuff that the inadequate DRCF facility had caused him, *inter alia*, to soil himself because he could not get to the bathroom or there were no bathrooms available to wheelchair-bound prisoners.  Mr. Andrews also grieved about the inaccessible recreation area, inaccessible showers, lack of wheelchair pushers, and inaccessible hallways and

facilities for wheelchair-bound prisoners.  DPSCS and Defendant Acuff admitted that DRCF is a non-ADA-compliant facility in many aspects and found these grievances to be meritorious.

48.     Despite medical orders for a prosthetic, DPSCS failed to procure a prosthetic for Mr. Andrews until early 2020.

49.     Importantly, by February 2020, Mr. Andrews did not require a wheelchair to ambulate, but DPSCS forced Mr. Andrews to remain wheelchair-bound (in a broken wheelchair) for his entire stay at DRCF.

50.     *Failure to Provide Jobs and Other Programming*.  DPSCS refused to provide a job to Mr. Rogers for most of his term of confinement, despite his being eligible for same.  Mr. Andrews repeatedly requested that DRCF case managers provide him with a job so that he could earn money, earn diminution credits, and occupy his time with substantive work like non-disabled prisoners at DRCF.  Instead, Mr. Andrews was forced to sit idle each day for several months, while his non-disabled peers enjoyed the benefits of prisoner job assignments.

51.     *Engagement in Retaliation and Interference*.  Mr. Andrews and the other prisoners who use wheelchairs have been subjected to unfair harassment that interferes with their equal access to DPSCS programs, services, and activities.  For instance, the correctional staff at DRCF told Mr. Andrews to stop filing grievances about the facility's ADA noncompliance or else he would be punished.

52.     *Failures to Provide Adequate Medical Care*.  Throughout his entire term of confinement, DPSCS also deprived Mr. Andrews of necessary medical care, including follow-up appointments with providers in the community to treat his diabetes, renal issues, and ophthalmology issues.  These included failing to approve medical appointments, failing to schedule appointments that were approved, and failing to transport Mr. Andrews to his appointments. DPSCS also failed to properly monitor Mr. Andrews' blood levels, especially given

the numerous medications that he was prescribed.  For example, DPSCS identified a serious renal failure in December 2019 that required immediate care with a nephrologist and comprehensive lab panels.  However, DPSCS failed to approve and/or schedule these follow-up visits for several months.

53.     These failures and delays continued the pattern of medical neglect that DPSCS demonstrated toward Mr. Andrews since the beginning of his incarceration; first with failing to monitor and treat Mr. Andrews' diabetes, then his foot ulcer, then his foot infection, then his osteomyelitis, then his amputations, then his need for a wheelchair and prosthetics, then his injuries sustained during a DPSCS van transport, then his renal failure, then his eye issues, and finally his medication management.  These repeated and ongoing failures caused irreversible and permanent physical and psychological harm, including two amputations, renal failure, and early onset blindness.

### *John Fishback*

54.     Mr. Fishback currently resides at ECI but has been incarcerated in DPSCS institutions since 2002.  Mr. Fishback suffers from bipolar disorder, which was diagnosed at approximately age eleven.  DPSCS has prescribed psychotropic medications to Mr. Fishback for this condition since the beginning of his incarceration.

55.     *Failures to Authorize and/or Implement Medical Orders*.  In approximately 2004, DPSCS, through its agents, volunteered Mr. Fishback for an experimental shoulder replacement surgery.  This procedure left Mr. Fishback disabled and with a chronic pain condition in his left shoulder.  For this chronic condition, DPSCS, through its agents, has prescribed non-opioid pain medication (Tramadol) to Mr. Fishback for more than ten years.  Without this medication, Mr. Fishback is in constant and intractable pain.  For nearly eighteen years, DPSCS also approved medical orders requiring Mr. Fishback to be handcuffed with his hands in front of him instead of

behind his back, or with two sets of handcuffs if cuffing his hands behind his back, because of his chronic shoulder disability.  Without this medical order, Mr. Fishback would experience extreme pain because his chronic shoulder disability limits his range of motion.  Indeed, for almost two decades, Mr. Fishback was handcuffed in front of his body without issue.

56.     In September 2018, Mr. Fishback was nearly killed when another prisoner stabbed him and severed his vertebral artery.  Mr. Fishback underwent multiple surgeries and had medical devices placed in his neck to repair that damage.  This experience further limited Mr. Fishback's range of motion in his upper extremities such that the front handcuff order became even more necessary as confirmed by medical personnel.  Moreover, DPSCS repeatedly failed to take Mr. Fishback to necessary follow-up appointments after his surgeries, which caused permanent injuries and unnecessary suffering.  Today, Mr. Fishback has permanent nerve damage in his face and neck, has difficulty breathing and speaking at times, and has vision problems.

57.     However, in November 2020, a DPSCS agent or employee revoked Mr. Fishback's front handcuff order and placed a written note in Mr. Fishback's housing tier advising officers to only handcuff Mr. Fishback behind his back.  Since November 2020, DPSCS has required Mr. Fishback to be handcuffed behind his back with only one set of handcuffs.  Otherwise, Mr. Fishback cannot leave his cell.  So, for more than two years, Mr. Fishback has been forced to choose—either handcuff behind his back with one set of handcuffs and endure the extreme pain that results, or remain in his cell with no access to programming, recreation, or even showers.  This Hobson's choice has caused Mr. Fishback to be deprived of crucial and medically necessary services, like mental health appointments, psychiatric programming, and groups.  Mr. Fishback has even had to limit his basic activities of daily living, like showers and recreation—for nearly two years.

58.     Troublingly, an RCI doctor placed a new medical order approving front handcuffing for Mr. Fishback in December 2020, but DPSCS has refused to approve and/or implement this order.

59.     Mr. Fishback also filed numerous sick call slips as instructed by DPSCS, but no one responds to those requests.

60.     Mr. Fishback has written directly to Defendants Campbell and Hill on multiple occasions, to which he never received the courtesy of a response.

61.     Mr. Fishback has filed numerous grievances about the handcuffing issue, which DPSCS found to be meritorious.  However, DPSCS still refused to take any action or re-implement Mr. Fishback's front handcuff order.  When Mr. Fishback filed additional grievances seeking to have the order reinstated, DPSCS summarily dismissed them.  Mr. Fishback has appealed the dismissals to the Inmate Grievance Office ("IGO"), which dismissed the appeal because the "grievance is beyond the jurisdiction of the IGO."  Thus, according to the IGO, Mr. Fishback is without an administrative remedy.

62.     As of this filing, DPSCS has not reinstated Mr. Fishback's front handcuff order.

63.     *Prolonged Solitary Confinement*.  DPSCS placed Mr. Fishback in administrative segregation—which is effectively solitary confinement—for more than one year between January 2021 and February 2022.  During that time, Mr. Fishback lived in a cell approximately the size of a parking space for approximately 22 hours per day or more, with or without a cellmate.  His cell was made of concrete and steel, had little natural light, and his personal possessions were restricted. Hour upon hour of Mr. Fishback's caged existence was spent in harsh conditions where persons with severe mental illness experience marked deterioration of their mental health, lack opportunities to experience wellness or recovery, and are at substantial risk of serious harm to their physical, emotional, and mental health.

64.     "Administrative segregation" is a form of segregated confinement that is imposed for a variety of reasons and for an indefinite period.  Individuals may be placed in administrative segregation while awaiting transfer to a different facility, for protective custody, or because DPSCS deems it appropriate.  Because there is no time limit for administrative segregation, some prisoners remain in this form of confinement for years and even decades.  Consequently, DPSCS routinely uses administrative segregation as a punitive measure, especially for prisoners with SMI.  DPSCS's "warehousing" of prisoners with SMI in administrative segregation is well-documented and has caused some of the most inhumane and egregious human rights violations against Maryland prisoners.

65.     Because of the realities described in the preceding Paragraph, Federal and state courts across the country have repeatedly held that placing prisoners with SMI in segregated confinement is cruel and unusual punishment under the Eighth Amendment.[1]

---

[1] *See, e.g., Indiana Protection & Advocacy Servs. Comm'n v. Commissioner*, 2012 WL 6738517 (S.D. Ind., Dec. 31, 2012) (holding that the Indiana Department of Correction's practice of placing prisoners with serious mental illness in segregation constituted cruel and unusual treatment in violation of the Eighth Amendment); *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1101-02 (W.D. Wis. 2001) (granting a preliminary injunction requiring the removal of prisoners with serious mental illness from "supermax" prison); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999), rev'd on other grounds, 243 F.3d 941 (5th Cir. 2001), adhered to on remand, 154 F. Supp. 2d 975 (S.D. Tex. 2001) ("Conditions in TDCJ-ID's administrative segregation units clearly violate constitutional standards when imposed on the subgroup of the plaintiffs' class made up of mentally-ill prisoners"); *Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) ("defendants' present policies and practices with respect to housing of [prisoners with serious mental disorders] in administrative segregation and in segregated housing units violate the Eighth Amendment rights of class members "); *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995) (holding prisoners with mental illness or those at a high risk for suffering injury to mental health in "Security Housing Unit" is unconstitutional); *Casey v. Lewis*, 834 F. Supp. 1477, 1549-50 (D. Ariz. 1993) (finding Eighth Amendment violation when "Despite their knowledge of the harm to seriously mentally ill inmates, ADOC routinely assigns or transfers seriously mentally ill inmates to [segregation units]"); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1988) (holding that evidence of prison officials' failure to screen out from SHU "those individuals who, by virtue of their mental condition, are likely to be severely and adversely affected by placement there" states an Eighth Amendment claim); *T.R. et al. v. S.C. Dept. of Corrections*, C/A No. 2005-CP-40-2925 (S.C. Ct. Comm. Pleas 5th J. Cir. Jan. 8, 2014) (finding major deficiencies in the Department of Corrections' treatment of prisoners with mental illness, including solitary confinement, and ordering defendants to submit a remedial plan). *See also* Letter from Jocelyn Samuels, Acting Assistant Att'y Gen., U.S. Dep't of Justice, Civil Rights Div. & David J. Hickton, U.S. Att'y, U.S. Att'y's Office, W.D. Penn. to Tom Corbett, Gov. of Pennsylvania, Re: Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities (Feb. 24, 2014), available at http://www.justice.gov/crt/about/spl/documents/pdoc_finding_2-24-14.pdf (finding, after a system-wide investigation, that state prisons across Pennsylvania "use[] solitary confinement in ways that violate the rights of prisoners with SMI/ID [serious mental illness and intellectual disabilities]," citing "conditions that are often unjustifiably harsh," and detailing a number of other Eighth Amendment violations stemming from the practice of

66.     In August 2014, the ACLU issued a Briefing Paper on the Dangerous Overuse of Solitary Confinement in the United States, which examined the continued use of solitary or segregated confinement especially for mentally ill prisoners.  On information and belief, DPSCS received, reviewed, and discussed the ACLU's findings at periodic quality control and audit meetings.  The ACLU report highlighted the universally accepted risks associated with segregating mentally ill prisoners.  For example, prisoners in segregated confinement were nearly seven times more likely to harm themselves than those in general population, and that the effect was particularly pronounced for individuals with SMI.  The ACLU cited numerous organizations that have issued formal policy statements opposing segregated confinements for SMI prisoners because of the irrefutable increased risk of harm caused by such confinement.  These organizations include the American Psychiatric Association ("APA"), Mental Health America, the American Public Health Association, the National Alliance on Mental Illness, and the Society of Correctional Physicians.

67.     The devastating effects of segregated confinement for SMI prisoners is so well-documented and widely accepted that in 2012, the APA issued a formal policy statement that prisoners with SMI should almost never be subjected to such confinement and in the rare event that isolation is necessary, they must be given extra clinical supports (i.e. out-of-cell structured activities like mental health/psychiatric treatment, recreation, and programming).

---

holding prisoners with serious mental illness in solitary confinement); Letter from Thomas E. Perez, Assistant Att'y Gen., U.S. Dep't of Justice, Civil Rights Div. to Tom Corbett, Gov. of Pennsylvania, Regarding the Investigation of the State Correctional Institution at Cresson (May 31, 2013), available at http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf; Response of the United States of America to Defendants' Motion in Limine No.4: To Exclude the Statement of Interest 2-5, *Coleman v. Brown*, Case No. 2:90-cv-0520 LKK DAD PC, Doc. No. 4919 (E.D. Cal. Nov. 12, 2013) (summarizing the United States government's position on the applicability of the Eighth Amendment to the placement of prisoners with serious mental illness in solitary confinement for prolonged periods of time).

68.     In its 2016 "Report and Recommendations Concerning the Use of Restrictive Housing," the United States Department of Justice recognized that restrictive housing can cause serious, long-lasting harm and stated that individuals with serious mental illness should be diverted from segregation absent exigent circumstances, and if used, then supplemental programming is required.[2]

69.     In 2018, the American Bar Association, recognizing the harm of segregation for individuals with serious mental illness, adopted a resolution urging the elimination of segregation for individuals with an intellectual disability or serious mental illness.[3]

70.     The United Nations adopted standard minimum rules for the treatment of prisoners in December 2015. Those rules specifically state that "the imposition of solitary confinement should be prohibited in the case of prisoners with mental or physical disabilities when their conditions would be exacerbated by such measures."[4]

71.     As explained by the Court of Appeals for the Third Circuit: [Solitary confinement] is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage. Specifically . . . researchers found that virtually everyone exposed to such conditions is affected in some way . . . . Anxiety and panic are common side effects.   Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent results.[5]

---

[2] See Report and Recommendations Concerning the Use of Restrictive Housing, Just. Dep't (Jan 2016), https://www.justice.gov/dag/file/815551/download.
[3] See Resolution No. 108A, ABA (Feb. 2018),
https://www.americanbar.org/content/dam/aba/directories/policy/2018-midyear/2018-mm-108a.pdf.
[4] See Rule 45, United Nations Standard Minimum Rules for the Treatment of Prisoners, U.N. OFF. DRUGS & CRIME (Dec. 2015), https://www.unodc.org/documents/justice-and-prison-reform/Nelson_Mandela_Rules-E-ebook.pdf.
[5] *Williams v. Sec'y Penn. Dep't of Corr.*, 848 F.3d 549, 566–67 (3d Cir. 2017).

72.     Both the National Institute of Corrections and the Vera Institute of Justice observed DPSCS's segregation practices and urged reforms to reduce the harmful effects of such practices. The Vera Institute of Justice reviewed Defendants' use of segregation in adult prisons and in a 2012 study found a "startling" lack of mental health staff and programming, which the study determined contributed to Maryland's over-reliance on segregation. The Vera Institute study recommended developing alternative programs for individuals with challenging behaviors.[6]

73.     The foregoing statistics are why more than ninety percent of prisoner suicides in Maryland occur in segregated confinement.

74.     Most troublingly, a Maryland prisoner cannot contest his placement on administrative segregation, nor is judicial review available.  Instead, the "review" process occurs exclusively within the prison and is effectively a rubber-stamp approval of continued administrative segregation regardless of the prisoner's mental health conditions or diagnoses.

75.     DPSCS committed Mr. Fishback to administrative segregation, for no reason, and kept him there for more than one year, for no reason, despite his SMI diagnosis and his physical disabilities.  During that time, DPSCS also revoked Mr. Fishback's front handcuff order.  Thus, DPSCS punished Mr. Fishback by placing him in a prison within a prison and forced him to endure extreme pain by handcuffing him in the back in order for him to leave his cell for any reason.

76.     During his year in administrative segregation, Mr. Fishback's medical and mental health conditions rapidly deteriorated.  However, rather than address Mr. Fishback's medical needs, DPSCS instead refused to provide him with even the most basic necessities, like toilet paper and prescription medications.

---

[6] See Preliminary Findings: Review of Maryland Dep't Pub. Safety and Correctional Servs. and Use of Segregation in Adult Prisons, VERA INST. JUST. (2012), https://d3n8a8pro7vhmx.cloudfront.net/interfaithaction/pages/13/attachments/original/14120269 36/VERA_study_-_Review_of_MD_Use_of_Segregation_in_Adult_Prisons.pdf?1412026936.

77.     Mr. Fishback filed numerous grievances about the subhuman conditions in segregation, but DPSCS either summarily dismissed them or refused to accept them altogether. Mr. Fishback wrote directly to Defendants Campbell, Hill, and Green about these issues but never received the courtesy of a response.  Thus, DPSCS made the paltry administrative remedy system unavailable to Mr. Fishback or at least rendered that scheme a dead letter.

78.     Mr. Fishback filed supplements to the grievances he submitted about the front handcuff issue.  He explained that the removed rear handcuff accommodation, together with his prolonged commitment to administrative segregation, caused him to remain in his cell for days and sometimes weeks on end, without access to medical care, psychiatric services, recreation, showers, telephones, and religious services.  However, DPSCS dismissed these grievances and claimed that it had "no jurisdiction" to intervene.  Thus, Mr. Fishback had no remedy and was left to suffer while his physical impairments and SMI worsened every day.

79.     *Continued Failures to Provide Medical Care*.  Even after Mr. Fishback was released from segregation in February 2021, DPSCS continued to neglect his serious medical needs.  For example, DPSCS medical providers diagnosed a heart abnormality in the fall of 2021 and ordered blood pressure checks several times a week to monitor that condition.  However, several months went by without any blood pressure checks.  Mr. Fishback filed grievances, which DPSCS found meritorious but still dismissed without providing any remedy.  Mr. Fishback appealed those dismissals to the IGO but never received the courtesy of a response.

80.     In July 2022, Mr. Fishback suffered a heart attack after months of DPSCS's failures to provide the cardiac care that its own medical personnel deemed necessary.

81.     Troublingly, DPSCS personnel have refused to provide Mr. Fishback with copies of many of his grievances and appeals, and they have also refused to respond to Mr. Fishback's repeated requests for copies of same so that he can comply with the IGO's document submission

requirements.  Again, DPSCS's conduct has made the administrative remedy system unavailable to Mr. Fishback.

82.     Another example relates to Mr. Fishback's eye condition, which DPSCS exacerbated by failing to schedule and take Mr. Fishback to follow-up appointments.  In December 2021, DPSCS medical providers ordered an ophthalmology consult to occur in two weeks.  By March 2022, having seen no specialist, Mr. Fishback filed a grievance, which DPSCS found meritorious and claimed to place Mr. Fishback on an upcoming appointment list.  However, that consult and follow-up never occurred.  Mr. Fishback appealed the meritorious finding to IGO because he was afforded no relief, but the IGO dismissed the grievance claiming that it had no jurisdiction over the claim.  Yet again, the administrative remedy system is plainly unavailable to Mr. Fishback.

83.     Another example relates to Mr. Fishback not receiving his prescription medications, sometimes for weeks.  Mr. Fishback filed grievances, which DPSCS found to be meritorious, but IGO still dismissed.  Amazingly, DPSCS admitted in its response that it had the necessary medication the entire time but refused to provide it to Mr. Fishback because DPSCS chose a new, cheaper, formulary that it had not yet received.  Thus, DPSCS deprived Mr. Fishback of medically necessary medications for his physical impairments and his SMI diagnoses even though DPSCS had those medications in its possession.

## CLAIMS FOR RELIEF

### COUNT I

**(42 U.S.C. §§ 12101-12165, 12202-12213—Discrimination Against Plaintiffs Because of Actual or Perceived Disabilities in Violation of the American With Disabilities Act)**

The previous paragraphs are incorporated as if fully set forth herein.

84.     Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

85.     Public entities may not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service" they provide, nor may they afford such individuals "an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others."  28 C.F.R. § 35.130(b)(1)(i)-(ii).  Further, public entities may not provide a qualified individual with an "aid, benefit, or service that is not as effective in affording equal opportunity" to gain a result or benefit and from "limit[ing] a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service."  *Id.* § 35.130(b)(1)(iii), (vii).

86.     The ADA prohibits public entities from imposing "eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."  *Id.* § 35.130(b)(8).  A public entity may "impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities . . . based on actual risk, not on mere speculation, stereotypes, or generalizations about individuals with disabilities."  *Id.* at 35.130(h).

87.     Public entities' administration of their facilities and policies may not "have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."  *Id.* § 35.130(b)(3).

88.     Public entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.* § 35.130(b)(7)(i).

89.     Title VI of the ADA prohibits discrimination against individuals for "oppos[ing] any act or practice made unlawful" by the ADA.  42 U.S.C. § 12203(a).  It also prohibits the retaliation against, or the interference, coercion, or intimidation by any individual who has opposed or assisted in the opposition of an act or right granted protection by the ADA.  *See* 42 U.S.C. § 12203.

90.     DPSCS's administrative grievance process, work programs, educational programs, diminution of confinement credits, and facilities are services, programs, or activities under 42 U.S.C. § 12132.

91.     Plaintiffs are individuals with actual or perceived disabilities.  Plaintiffs are "qualified individuals with a disability" as contemplated in Title II of the ADA, 42 U.S.C. § 12131(2).

92.     Defendants are departments, agencies, and instrumentalities of the State of Maryland, or representatives, agents, and employees of those entities, and are public entities as defined in the ADA.  12 U.S.C. § 1231(1)(B).

93.     As prisoners committed to the custody of DPSCS, Plaintiffs are entitled to participate in and receive benefits of these services, programs, and activities.

94.     Defendants have a pattern and practice of coercing, intimidating, threatening, and/or interfacing with prisoners' exercise or enjoyment of their ADA rights, and doing so because prisoner have exercised or enjoyed their ADA rights or aided and encouraged others to do so.

95.     Defendants use eligibility criteria that either explicitly or tacitly screen out prisoners with disabilities.

96.     Defendants fail to maintain in operable working condition the features required for programs, services, and activities to be readily accessible to prisoners with disabilities.

97.     Defendants have denied, and continue to refuse Plaintiffs equal access to and benefits from DPSCS's services, programs, and activities because of Plaintiffs' disabilities or perceived disabilities.  Defendants discriminate against Plaintiffs by failing to make reasonable accommodations to DPSCS facilities that would allow Plaintiffs to safely access those facilities and participate in the services, programs, and activities made available to other non-disabled prisoners.  Defendants have unfairly denied equal access to DPSCS's work release programs because of Plaintiffs' disabilities.  Retaliation by Defendants' and their agents and employees against Plaintiffs for filing grievances and complaining about DPSCS's noncompliant facilities also constitutes discrimination against Plaintiffs because of their disabilities.

98.     Defendants' administration of housing assignments and security classifications has the effect of subjecting Plaintiffs to discrimination on the basis of their disabilities and substantially impairs the objectives of the prisoner housing program by subjecting Plaintiffs to exploitation, safety hazards, and neglect.  Defendants fail to house prisoners in the most integrated setting appropriate to their needs; places prisoners in facilities that do not offer the same programming as other facilities; and deprives prisoners with disabilities of visitation with family members by placing them in distant facilities where they would not otherwise be housed.

99.     Defendants have retaliated against Plaintiffs by revoking or restricting their privileges, harassing them, threatening to confiscate their property, placing them in inappropriate housing assignments based on their security classification levels and/or their disability-related needs, and summarily rejecting their grievances and complaints.

100.     On information and belief, Defendants' ongoing ADA violations have also caused Plaintiffs to serve longer terms of confinement than non-disabled prisoners solely because of their disability or perceived disability.  Specifically, Defendants' noncompliant policies limit the jobs available to Plaintiffs because of their disabilities, making Plaintiffs unable to earn diminution of confinement credits in the same way as their non-disabled peers.

101.     Plaintiffs are also routinely denied appropriate and timely medical care, follow-up treatment, and medical supplies.  This practice has resulted in the Mr. Andrews being unable to repair his wheelchair when necessary, or to use the bathroom in a safe and sanitary manner, and has caused him to suffer embarrassment, humiliation, and tremendous physical and emotional discomfort.

102.     Mr. Fishback has medical conditions that DPSCS uses as excuses to refuse him access to programming, services, and accommodations.  Moreover, DPSCS uses Mr. Fishback's SMI diagnosis as an excuse to punish him by placing him on administrative segregation without justification and without access to treatment.

103.     Therefore, the Plaintiffs are disadvantaged, as compared to their non-disabled peers, solely because of their disabilities.

104.     The Plaintiffs also have no privacy during their medical appointments because of Defendants' noncompliance.  For example, Mr. Andrews did not enjoy the same partition or privacy wall/curtain during their medical visits because DRCF is not designed to adequately accommodate wheelchairs in the medical unit.  This caused Mr. Andrews to lose his medical privacy and confidentiality in the doctor/patient relationship.

105.     Similarly, Mr. Andrews had no privacy when using the bathroom because of Defendants' noncompliance.  As previously described, DRCF lacks the proper ratio of handicap-

accessible bathrooms to prisoners, causing disabled prisoners to use other bathrooms that are not designed to accommodate their needs.

106.   Similarly, Mr. Fishback had no medical privacy while he was in segregation for more than one year.   While Defendants are supposed to provide mental health "rounds" to individuals in segregation, these are cell-front checks during which a health professional asks about the status of individuals through brief questions shouted through the steel cell door.   Rounds do not provide treatment and they are not confidential because the conversations occur in the presence of other incarcerated individuals, cellmates, and custody staff.

107.   The defendants' repeated refusals to make reasonable modifications to DPSCS facilities by providing ADA-required safety features has subjected Plaintiffs to discrimination on the basis of their disability.   The defendants' failure to make reasonable modifications to DPSCS's programs has excluded the Plaintiffs from participating on the basis of Plaintiffs' disabilities.

108.   Plaintiffs have suffered physical injuries and are regularly exposed to dangerous conditions as a result of the Defendants' refusal to make reasonable modifications to DPSCS facilities.   Because of Defendants repeated and ongoing violations, Plaintiffs must routinely place themselves in situations that are highly likely to cause significant injuries or have already caused significant injuries as a result of Defendants' noncompliant bathrooms, showers, cells, access ramps, and other services and facilities.   Plaintiffs have also suffered physical and emotional injuries because of the Defendants' failure to provide addiction counseling and drug detoxification programs.

109.   Plaintiffs have suffered damages in the form of lost wages, lost diminution credits, and a lack of vocational training from the Defendants' failure to make reasonable modifications to DPSCS policies.

110.    Defendants continue to house Plaintiffs and other disabled prisoners in noncompliant prison facilities without providing reasonable modifications to the facility by adding the safety features required by the ADA.  Accordingly, Plaintiffs and other disabled prisoners are exposed to a substantial risk of injury—a risk that routinely materializes into actual physical injury.

111.    Defendants continue to operate its prison facilities under explicit or tacit policies that exclude Plaintiffs and other disabled prisoners from important educational, vocational, and other vital programs that are intended to both satisfy the minimal constitutional baseline concerning conditions of confinement.

112.    As a result, Plaintiffs are significantly disadvantaged upon their release from incarceration, especially as compared to their non-disabled peers, because Plaintiffs have a host of medical and emotional issues with which to contend—all caused or exacerbated by Defendants' noncompliance.

113.    Defendants' discrimination against Plaintiffs and failure to comply with the ADA will continue to put Plaintiffs at a severe disadvantage upon release and expose Plaintiffs to situations that are likely to cause substantial harm.  Plaintiffs will continue to be harmed unless Defendants make the reasonable modifications required by the ADA.

114.    Defendants are firmly aware of the myriad violations noted herein, but have failed to correct them, thus exhibiting deliberate indifference to the rights of Plaintiffs and those similarly situated in DPSCS custody.

115.    Defendants' pattern, practice, and deliberate indifference as described herein has proximately caused harm to individuals with disabilities in DPSCS custody, and Plaintiffs have suffered, and continue to suffer from harm and violations of their ADA rights.

116.    Accordingly, Plaintiffs are entitled to compensatory damages and such other and further relief as demanded herein.

## COUNT II

**(29 U.S.C. § 794 Discrimination Against Plaintiffs Because of Disability
In Violation of Section 504 of the Rehabilitation Act)**

The previous paragraphs are incorporated as if fully set forth herein.

117.    Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a).

118.    Section 504 defines "[p]rogram or activity as" "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government." *Id.* § 794(b)(1)(A)-(B).  The requirements of Section 504 apply "to each recipient of Federal financial assistance from the Department of Justice and to each program or activity receiving such assistance."  28 C.F.R. § 42.502.

119.    A recipient of federal funding may not "[d]eny a qualified handicapped person the opportunity accorded others to participate in the program or activity receiving Federal financial assistance" or "[d]eny a qualified handicapped person an equal opportunity to achieve the same benefits that others achieve in the program or activity receiving Federal financial assistance." *Id.* § 42.503(b)(i)-(ii).  Further, federally funded programs are prohibited from denying "a qualified handicapped person an equal opportunity to participate in the program or activity by providing services to the program." *Id.* § 42.503(iv).

120.    Entities receiving federal funding must "administer programs or activities in the most integrated setting appropriate to the needs of qualified handicapped persons."  *Id.* § 42.503(d).  The entity is prohibited from "purposely or in effect discrimin[ating] on the basis of handicap, defeat or substantially impair accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons, or perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State."  *Id.* § 42.503(b)(3).

121.    Defendants employ more than 15 individuals and, by way of operating every Maryland state prison, including DRCF, WCI, and MRDCC, receive federal grants and funding to administer these facilities.  Accordingly, Defendants must follow the mandates of Section 504.

122.    Defendants have a pattern and practice of excluding qualified individuals with disabilities, like Plaintiffs, from participating in and enjoying the benefits of programs, services, or activities, solely because of their disabilities.   Such pattern and practices constitute discrimination against Plaintiffs.

123.    Defendants, through the operation every Maryland prison, offer programs, services, and activities to prisoners, such as an administrative grievance process, work programs, diminution credits, education programs, vocational training, inmate housing, and counseling.  Defendants' programs, services, and activities are offered as means to help prisoners transition into society and provide useful skills that allow newly released prisoners to be self-reliant upon release.  These programs and activities are also essential in reducing the potential for recidivism.

124.    Plaintiffs, as individuals with disabilities or perceived disabilities, are individuals specifically contemplated by Section 504.

125.    As prisoners committed to DPSCS custody, Plaintiffs are eligible to participate in and receive the benefits of each of these services, programs, or activities.  *Id.* § 42.540(l)(2).

126.    As described herein, Defendants deny Plaintiffs equal access to and benefits from services, medical care, programs, and activities because of Plaintiffs' disabilities or perceived disabilities.

127.    Plaintiffs have suffered physical injuries as a direct and proximate cause of Defendants' discrimination.

128.    Moreover, Plaintiffs have lost the opportunity to receive wages, diminution credits, and vocational training and will continue to experience these losses upon release.  On information and belief, this discrimination has and continues to cause disabled prisoners, like Plaintiffs, to remain incarcerated for longer terms of confinement than non-disabled prisoners.

129.    Defendants have retaliated against Plaintiffs by revoking or restricting their privileges, harassing them, threatening to confiscate their property, refusing to discuss these ongoing issues with them, and by making the administrative grievance system unavailable.

130.    Defendants' failures to provide equal access to their services, benefits, activities, programs, privileges, and to provide reasonable modifications and accommodations, are policies, regular practices, and/or customs of the Defendants.

131.    Defendants' continued failure to comply with the Rehabilitation Act has caused, and will continue to cause, harm to Plaintiffs.  Plaintiffs will continue to be harmed unless and until Defendants are ordered by this Court to make modifications to their policies, practices, procedures, and facilities pursuant to Section 504.

132.    Defendants' pattern, practice, and deliberate indifference as described herein has proximately caused harm to individuals with disabilities in DPSCS custody, and Plaintiffs have suffered, and continue to suffer from harm and violations of their rights under the Rehabilitation Act.

133.     Accordingly, Plaintiffs are entitled to compensatory damages and such other and further relief as demanded herein.

## COUNT III

### (42 U.S.C. § 1983 – Cruel and Unusual Punishment and Pattern and Practice of Deliberate Indifference)

The previous paragraphs are incorporated as if fully stated herein.

134.     The Eighth Amendment to the United States Constitution, which is incorporated against the states by the Fourteenth Amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

135.     Plaintiffs bring suit pursuant to 42 U.S.C. § 1983 to seek redress for Defendants' infliction of cruel and unusual punishments.  Defendants fail to make reasonable accommodations to their policies and procedures or to provide Plaintiffs auxiliary aids or services to allow Plaintiffs to safely navigate DPSCS facilities, and to access the medical care, programming, and services available to other non-disabled prisoners.

136.     Defendants also refuse to consider Plaintiffs' disabilities in housing, work, recreation, programming, and other areas all of which severely limit, if not bar entirely, Plaintiffs from participating in activities of daily living that are available to their non-disabled peers. Defendants refuse to make reasonable accommodations despite Plaintiffs' multiple written requests and grievances.

137.     Defendants are aware of the harms and risks created by their policies and/or the way their policies are implemented and have refused to make reasonable accommodations to DPSCS facilities or policies.

138.     Defendants were personally involved in the alleged constitutional and statutory violations in that each of them:  (a) directly participated in the infraction; (b) failed to remedy the

wrong after learning of the violation through written complaints and grievances; (c) created a policy or custom under which unconstitutional and unlawful practices occurred; (d) allowed such a policy or custom to continue; (e) ignored the longstanding pattern of ADA noncompliance; and (f) was deliberately indifferent in both their own conduct and in managing their subordinates, which indifference caused the constitutional violations described herein.

139.    Plaintiffs have sustained, and continue to suffer serious and unreasonable risks of harm by the conduct of the Defendants, including but not limited to, physical injury, humiliation, disruption of their relationships with their loved ones, severe anxiety and emotional distress, extended terms of confinement because they are unable to earn diminution credits as they should, financial hardships, and other ongoing failures as described herein.

140.    Plaintiffs have been harmed by the conduct of Defendants and are each entitled to compensatory and punitive damages.

## COUNT IV

### (Violations of Articles 16 and 25 of the Maryland Declaration of Rights)

The previous paragraphs are incorporated as if fully set forth herein.

141.    At all relevant times, each Defendant was acting under the color of state law as departments, officers, and employees of the State of Maryland, and their acts and/or omissions were conducted within the scope of their official duties or employment.

142.    As described herein, Defendants' acts and omissions deprived the Plaintiffs of their rights under the Maryland Declaration of Rights, Articles 16 and 25, to be free from cruel and unusual punishment.

143.    The acts and omissions described herein caused injuries to the Plaintiffs.

144.     At all relevant times, Defendants were acting pursuant to DPSCS custom, policy, authority, decision, ordinance, regulation, widespread habit, usage, or practice in their actions toward the Plaintiffs.

145.     As a direct and proximate result of the Defendants' conduct, as described herein, the Plaintiffs have suffered actual physical and emotional injuries, and other damages and losses, some of which may be continuing in nature, thereby entitling Plaintiffs to compensatory and special damages.

146.     Plaintiffs are therefore entitled to money damages to compensate them for their injuries and for the violation and deprivation of their rights under the Maryland Declaration of Rights.

## COUNT V

### (Negligence)

Plaintiffs incorporate the previous paragraphs as if fully set forth herein.

147.     Defendants owed a duty to Plaintiffs arising out of their special relationship to protect against unreasonable risk of physical harm.

148.     Defendants breached their duty for all the reasons explained herein.

149.     These avoidable breaches caused the Plaintiffs to sustain serious and permanent physical and psychological injuries.

WHEREFORE, Plaintiffs demand that judgment be entered in their favor and against the Defendants, jointly and severally, in an amount greater than seventy-five thousand dollars ($75,000.00).

Respectfully submitted,

Allen E. Honick, AIS No. 1612130266
Dustin C. Furman, AIS No. 1612130239
**FURMAN | HONICK LAW**
11155 Red Run Boulevard, Suite 110
Owings Mills, Maryland 21117
(410) 844-6000 - Phone
(410) 705-5651 - Facsimile
allen@fhjustice.com
***Counsel for Plaintiffs***

## DEMAND FOR JURY TRIAL

The Plaintiffs respectfully request that this matter be heard by a jury.

**Allen E. Honick, AIS No. 1612130266**