**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **MICHAEL ANDREWS, et al,** | * | |
| *Plaintiffs*, | * | |
| **v.** | * | **Case No. 1:23-cv-00172-JMC** |
| **MARYLAND DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, et al,** | * | |
| *Defendants.* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>**MEMORANDUM OPINION**</u>

Plaintiffs, John Fishback and Michael Andrews, brought this suit in Maryland state court against seven Defendants, alleging violations of (1) the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*; ("ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act"); (3) 42 U.S.C. § 1983; (4) Articles 16 and 25 of the Maryland Declaration of Rights; and (5) negligence.  (ECF No. 2).  The seven Defendants include: (1) Maryland Department of Public Safety and Correctional Services ("DPSCS"), (2) Robert L. Green, (3) Wayne Hill, (4) Annie D. Harvey, (5) Carolyn Scruggs, (6) Jama Acuff, and (7) Casey Campbell.  *Id.*  Defendants removed the case to this Court on January 23, 2023.  (ECF No. 4).  Presently before the Court is Defendants' collective Partial Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (the "Motion").  (ECF No. 40).  After granting several motions for extension of time (ECF Nos. 41, 43, 45, 50, 52), the Court has additionally considered Plaintiffs' Opposition and Defendants' Reply thereto (ECF Nos. 47, 53).  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  For the reasons that follow, Defendants' Motion, treated as a motion to dismiss, will be granted in part and

1

denied in part.

## I.     BACKGROUND

Plaintiff Andrews is a Maryland resident who was formerly committed to the custody of DPSCS and resided at the Dorsey Run Correctional Facility ("DRCF").  (ECF No. 2 at 5).[1] Mr. Andrews is a "wheelchair-bound," diabetic, single-leg amputee.  *Id.*  Plaintiff Fishback is and was at all times relevant to Plaintiffs' claims also committed to the custody of the DPSCS as an inmate and currently resides at the Eastern Correctional Institution ("ECI").  *Id.*  Defendant Green is the Secretary of DPSCS; Defendant Hill is the Deputy Secretary of Operations for DPSCS; Defendant Harvey is the Commissioner of Correction for DPSCS; Defendant Scruggs is the Assistant Secretary of Programs, Treatment, and Re-Entry for DPSCS; Defendant Acuff was, on information and belief, the warden of DRCF at all times relevant to Plaintiffs' claims; and Defendant Campbell is the former warden at DRCF and RCI.  *Id.* at 6–7.

### A.  Plaintiff Andrews' Allegations

Plaintiff Andrews was incarcerated at DRCF between January 2019 and 2021.  *Id.* at 10. He had both of his legs but was wheelchair-dependent upon his commitment to DPSCS because of a left foot ulcer.  *Id.*  Mr. Andrews arrived at DRCF with medical orders for a wheelchair because of ambulation issues resulting from his foot ulcer.  *Id.*  However, Mr. Andrews alleges that DPSCS refused to prove Mr. Andrews with a wheelchair and instead provided him with a cane.  *Id.* at 11. This was "just the beginning of a nearly three-year period of continuing violation and harm, which only ended after Mr. Andrews was released."  *Id.*  By April 2019, Mr. Andrews' left foot had

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document.  At the motion to dismiss stage, the Court "accept[s] as true all well-pleaded facts and construe[s] them in the light most favorable to the plaintiff."  *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 268 (4th Cir. 2022).

become seriously infected because he was forced to walk on it every day despite medical orders to the contrary, ultimately resulting in Mr. Andrews' left fifth toe requiring amputation. *Id.* And although DPSCS was supposed to have a wheelchair ready for Mr. Andrews after his amputation surgery, DPSCS only initially provided a wheelchair to Mr. Andrews before exchanging it with a walking boot on May 1, 2019. *Id.*

By the end of June 2019, Mr. Andrews' kidneys began failing "because of the continuing infection in his left lower extremity that could not heal because he was forced to walk on it every day and because of [] improper diet." *Id.* Mr. Andrews' left lower extremity issues persisted and, by August 2019, Mr. Andrews' infection was so severe that he was diagnosed with osteomyelitis before undergoing a left below-the-knee amputation on September 3, 2019. *Id.* at 12. DPSCS then refused to provide Mr. Andrews with a wheelchair after his surgery for at least one week despite medical orders to the contrary. *Id.* Mr. Andrews "filed a grievance with DRCF about this issue, which DPSCS and Defendant Acuff found to be meritorious." *Id.*

In the fall of 2019, DPSCS transported Mr. Andrews (in his wheelchair) to a medical appointment in a van that was not wheelchair accessible. *Id.* Mr. Andrews' wheelchair subsequently flipped over and caused him injuries when the van made a turn en route to the appointment because of the van's noncompliance and the correctional officers' failure to properly secure Mr. Andrews. *Id.* Mr. Andrews also filed a grievance regarding this incident, which DPSCS and Ms. Acuff also found to be meritorious but disclaimed any responsibility for the incident beyond placing Mr. Andrews in a non-compliant vehicle. *Id.* Defendant Acuff even accused Mr. Andrews of making an unsubstantiated injury claim resulting from the incident. *Id.*

Mr. Andrews claims that "Throughout the fall and winter of 2019," he "experienced the same challenges that every other wheelchair-bound prisoner at DRCF has faced with even the most basic activities of daily living." *Id.* at 12–13.  For instance, Mr. Andrews submits that DRCF is not wheelchair accessible or otherwise ADA-compliant because of (1) no shower hose, grab rails, or adjustable seats in DRCF's shower facilities; (2) the designated handicapped toilet was not the appropriate height; (3) the handicapped housing unit did not have enough space between the beds for wheelchair-bound prisoners to safely navigate; (4) doorways were not cut wide enough to safely allow wheelchair access; (5) the exercise area was on a slope and contained loose flat rocks making wheelchair access impossible; (6) the tables in the dining and visiting rooms were too low and not handicap accessible; (7) the handicap housing unit contained many more wheelchair-bound prisoners than its design safely allowed; and (8) there was only one handicap accessible bathroom for approximately sixty prisoners, both handicapped and otherwise.  *Id.* at 13. Additionally, the DPSCS-provided wheelchair that Mr. Andrews used routinely broke and needed maintenance, and DRCF failed to provide Mr. Andrews with a "pusher"—another prisoner designated to assist and push Mr. Andrews around the facility.  *Id.*  Mr. Andrews filed additional internal grievances regarding the above conditions after they caused Mr. Andrews to, among other things, soil himself because he could not access the bathrooms as needed.  *Id.*

Mr. Andrews' discharge following his second amputation surgery was also accompanied by a medical order that he receive a prosthetic once his surgical wound healed. *Id.* at 12.  DPSCS failed to procure such a prosthetic until "early 2020."  *Id.* at 14.  Then, by February 2020 (presumably once Mr. Andrews received the prosthetic), DPSCS forced Mr. Andrews to remain wheelchair bound despite Mr. Andrews not requiring the wheelchair to ambulate effectively.  *Id.*

4

Mr. Andrews alleges the following additional facts regarding his treatment while subject to the Defendants' control: DPSCS refused to provide him with a job for most of his confinement despite his eligibility and ability to work; he and other prisoners who use wheelchairs were regularly subject to unfair harassment like the DRCF correctional staff threatening Mr. Andrews with punishment if he did not stop filing grievances; and DPSCS deprived Mr. Andrews of necessary medical care. *Id.* at 14–15.  Accordingly, Mr. Andrews alleges that "these repeated and ongoing failures caused irreversible and permanent physical and psychological harm, including two amputations, renal failure, and early onset blindness." *Id.* at 15.

      B.  <u>Plaintiff Fishback's Allegations</u>

Plaintiff Fishback currently resides at ECI but has been incarcerated within DPSCS institutions since at least 2002.  *Id.*  Mr. Fishback was diagnosed with bipolar disorder at approximately age eleven for which DPSCS has prescribed psychotropic medications to Mr. Fishback since the beginning of his incarceration.  *Id.*  Mr. Fishback first alleges that, in approximately 2004, DPSCS volunteered Mr. Fishback "for an experimental shoulder replacement surgery" which left Mr. Fishback disabled and with chronic shoulder pain.  *Id.*  DPSCS accordingly prescribed non-opioid pain medication to Mr. Fishback for at least the next ten years and permitted Mr. Fishback to be handcuffed with his hands in front of him (rather than behind) for at least the next eighteen years.  *Id.* at 15–16.  "Without this medical order, Mr. Fishback would experience extreme pain because his chronic shoulder disability limits his range of motion.  Indeed, for almost two decades, Mr. Fishback was handcuffed in front of his body without issue." *Id.* at 16.

In September 2018, Mr. Fishback was nearly killed when another prisoner stabbed him and severed his vertebral artery.  *Id.*  Multiple surgeries ensued which further limited Mr. Fishback's

range of motion such that the front handcuff order became "even more necessary." *Id.* However, DPSCS repeatedly failed to take Mr. Fishback to necessary follow-up appointments, which caused permanent injuries to Mr. Fishback including permanent nerve damage in his face and neck, breathing issues, speech difficulties, and vison problems. *Id.* DPSCS also revoked Mr. Fishback's front handcuff order in November 2020. *Id.* Because DPSCS simultaneously required Mr. Fishback to be handcuffed in order to leave his cell, Mr. Fishback was forced to choose between "endur[ing] the extreme pain that results" from being handcuffed behind his back and "remain[ing] in his cell with no access to programming, recreation, or even showers." *Id.* This situation persisted for at least the following two years after DPSCS refused to approve and/or implement a December 2020 order from an RCI doctor placing a new medical order approving front handcuffing for Mr. Fishback. *Id.* at 16–17. Mr. Fishback claims that DPSCS has repeatedly refused to re-implement the front handcuffing order despite Mr. Fishback filing numerous meritorious grievances. *Id.* at 17. DPSCS still had not reinstated Mr. Fishback's front handcuffing order as of the date Plaintiffs filed their Complaint. *Id.*

DPSCS eventually placed Mr. Fishback in "administrative segregation—which is effectively solitary confinement—"between January 2021 and February 2022, where Mr. Fishback lived "in a cell approximately the size of a parking space for approximately 22 hours per day or more." *Id.* Mr. Fishback claims that his placement in administrative segregation was without reason and that his "medical and mental health conditions rapidly deteriorated" as a result of his unwarranted segregation. *Id.* at 21. Further, DPSCS regularly refused to provide Mr. Fishback with basic necessities like toilet paper and prescription medications rather than addressing Mr. Fishback's needs. *Id.* Mr. Fishback filed numerous grievances about his living conditions while

administratively segregated as well as "supplements to the grievances he submitted about the front handcuff issue" to no avail.  *Id.* at 22.

Finally, DPSCS allegedly continued to neglect Mr. Fishback's medical needs upon his release from administrative segregation in February 2021.  *Id.* at 22.  For instance, Mr. Fishback asserts that his blood pressure went unmonitored despite DPSCS medical providers diagnosing Mr. Fishback with a heart abnormality in the Fall of 2021; he suffered a heart attack in July 2022 after DPSCS's failure to provide proper cardiac care; DPSCS exacerbated Mr. Fishback's eye condition(s) by failing to schedule and take Mr. Fishback to follow-up appointments; and that DPSCS has failed to timely provide Mr. Fishback with his required prescription medications.  *Id.* at 22–23.

Based on the above allegations, Plaintiffs filed the present lawsuit alleging violations of the ADA, Rehabilitation Act, 42 U.S.C. § 1983, Maryland Declaration of Rights, and common law negligence principles.  Plaintiffs further clarify in their Opposition that Counts I (ADA) and II (Rehabilitation Act) are against DPSCS only; Count III (§ 1983) is against Ms. Acuff and Mr. Campbell, individually, only; and Counts IV (Md. Dec. of Rights) and V (negligence) are against all Defendants.  (ECF No. 47 at 1).

## II.      STANDARD OF REVIEW

### A.  Motion to Dismiss for Lack of Subject Matter Under Rule 12(b)(1) and Sovereign Immunity

"A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint."  *Foster v. Howard Cmty. Coll.*, No. CIV.A. RDB-13-1395, 2014 WL 758027, at *1 (D. Md. Feb. 24, 2014).  "This challenge under Rule 12(b)(1) may proceed either as a facial

challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" *Id.* (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)).  Defects in subject matter jurisdiction cannot be waived or consented to.  *Roche v. Lincoln Prop. Co*., 373 F.3d 610, 621 (4th Cir. 2004), *rev'd on other grounds*, 546 U.S. 81 (2005); *State v. Ivory*, 906 F.2d 999, 1001 n.2 (4th Cir. 1990).

State sovereign immunity provides that "a state may not be sued by a private citizen absent its consent . . . ." *Dennard v. Towson Univ.*, 62 F. Supp. 3d 446, 450 (D. Md. 2014); *see Effland v. Balt. Police Dep't*, No. 1:20-cv-3503-CCB, 2022 WL 3107144, at *6 (D. Md. Aug. 4, 2022) ("Under the doctrine of sovereign immunity, neither a contract nor a tort action may be maintained against the State unless specific legislative consent has been given and funds (or the means to raise them) are available to satisfy the judgment.").  Although state sovereign immunity originates in the Eleventh Amendment to the U.S. Constitution, "common law sovereign immunity 'predated' adoption of the Eleventh Amendment, which 'confirmed, rather than established, sovereign immunity as a constitutional principle.'" *Dennard*, 62 F. Supp. 3d at 450 (quoting *Stewart v. North Carolina*, 393 F.3d 484, 488 (4th Cir. 2005)).  When a defendant raises the defense of Eleventh Amendment sovereign immunity, the Court "reviews that defense under Federal Rule of Civil Procedure 12(b)(1)." *Krell*, 2018 WL 6523883 at *3; *see Criscione v. U.S. Nuclear Regul. Comm'n*, 493 F. Supp. 3d 423, 430 (D. Md. 2020).  "[T]he burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019).

The Fourth Circuit has "noted important differences between a traditional subject matter jurisdiction analysis under Article III to the Constitution as compared to the hybrid jurisdictional analysis required by the Eleventh Amendment." *Forrest v. Balt. City, Md.: Balt. Police Dep't*, No. 1:22-CV-03220-JMC, 2023 WL 3847429, at *4 (D. Md. June 6, 2023). For instance, unlike traditional subject matter jurisdiction, Eleventh Amendment sovereign immunity may be waived by the parties and imposes no requirement on a court to raise the issue *sua sponte*. *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479–80 (4th Cir. 2005). Nevertheless, the weight of authority in this District indicates that Eleventh Amendment sovereign immunity challenges are best resolved under Rule 12(b)(1) rather than Rule 12(b)(6), so the Court continues to do so here. *See, e.g.*, *Gross v. Morgan State Univ.*, 308 F. Supp. 3d 861, 865 (D. Md. 2018) (collecting cases); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 579 n.6 (D. Md. 2021).

      B. <u>Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6) or, in the Alternative, for Summary Judgment Under Rule 56</u>

The purpose of Federal Rule of Civil Procedure 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotations omitted). To survive a Rule 12(b)(6) motion to dismiss, "detailed factual allegations are not required, but a plaintiff must provide the grounds of his entitlement to relief," which requires "more than labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 561–62 (D. Md. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)) (internal quotations omitted). In considering a

motion to dismiss, "the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole." *Humphrey v. Nat'l Flood Ins. Program*, 885 F.Supp. 133, 136 (D. Md. 1995) (internal citations omitted).  The Court must also construe the facts and reasonable inferences from the facts in the light most favorable to the plaintiff.  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Petry*, 597 F. Supp. 2d at 562 ("Once a claim has been stated adequately . . . it may be supported by showing any set of facts consistent with the allegations in the complaint.") (quoting *Twombly*, 550 U.S. at 546).

"As a general rule, the court does not consider extrinsic evidence at the motion to dismiss stage . . . ."  *Reamer v. State Auto. Mut. Ins. Co.*, 556 F. Supp. 3d 544, 549 (D. Md. 2021) (other citation omitted).  However, "the court may consider, without converting the motion to dismiss into one for summary judgment, documents attached to the complaint as exhibits, and documents attached to a motion to dismiss if the document is 'integral to the complaint and there is no dispute about the document's authenticity.'"  *Id.* (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)).  "A document is 'integral' to the complaint if its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'"  *Reamer*, 556 F. Supp. 3d at 59 (citing *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)).

Defendant styles its Motion as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  "A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure."  *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020).  The Court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is

offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." *Id.* at 626 (citation omitted). "Ordinarily, summary judgment is inappropriate where the parties have not had an opportunity for reasonable discovery." *Id.* The Court will exercise its discretion by treating the Motion as one for dismissal rather than summary judgment.

## III.    ANALYSIS

### A.    The Continuing Harm Doctrine Applies to Plaintiff Andrews' Claims

Defendants first argue that all of Plaintiff Andrews' claims which accrued prior to October 21, 2019, must be dismissed because they are barred by the applicable statute(s) of limitations. (ECF No. 40-1 at 13). Both parties agree that a three-year statute of limitations applies to all of Plaintiffs' claims.[2] Plaintiffs filed their Complaint on October 21, 2022, and thus the three-year statute of limitations presumably bars any alleged wrongful conduct that occurred prior to October 21, 2019. However, Plaintiffs argue that Mr. Andrews' pre-October 21, 2022, claims are preserved under the continuing harm doctrine. (ECF No. 47 at 4). "The continuing harm doctrine tolls the statute of limitations in cases of ongoing or continuous violations." *Clark v. Bank of Am., N.A.*,

---

[2] This Court has previously noted that neither 42 U.S.C. § 1983, the ADA, nor the Rehabilitation Act contain a statute of limitations. However, the Court has consistently found that the applicable statute of limitations for all three statutes, by reference to analogous state law claims, is Maryland's general three-year statute of limitations. *See A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011) (noting that federal courts "borrow the state statute of limitations that applies to the most analogous state-law claim" where a federal statute provides no statute of limitations); *Emrit v. Md. State Bar Ass'n*, No. CV JKB-15-2548, 2015 WL 11027774, at *1–2 (D. Md. Sept. 10, 2015), *aff'd*, 624 F. App'x 115 (4th Cir. 2015) (acknowledging that Maryland's general three-year statute of limitations applies to Title II of the ADA and 42 U.S.C. § 1983); *Benton v. Prince George's Cmty. Coll.*, No. CIV.A. DKC 12-1577, 2013 WL 4501324, at *4 (D. Md. Aug. 21, 2013) ("Maryland courts apply the three-year statute of limitations period governing general civil actions to ADA and Rehabilitation Act claims."); Md. Code Ann., Cts. & Jud. Proc. Art. § 5-101; *compare Ott v. Md. Dep't of Pub. Safety & Corr. Servs.*, 909 F.3d 655, 659–60 (4th Cir. 2018) (applying two-year statute of limitations to Rehabilitation Act claims in employment discrimination case because amendments to Maryland's Fair Employment Practices Act provided the closest analogue to plaintiff's claims), *with Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 250–51 (4th Cir. 2022) (applying state's general three-year statute of limitations to Rehabilitation Act claims involving the provision of public services).

561 F. Supp. 3d 542, 559 (D. Md. 2021).  Under the continuing harm doctrine, "each new repetition of the wrong creates further liability . . . and a new statute of limitations begins to run after each wrong perpetuated."  *McCray v. Hous. Auth. of Balt. City*, No. CV RDB-18-2271, 2019 WL 4120750, at *5 (D. Md. Aug. 29, 2019).  "Although a cause of action for a continuous injury is not cut off by the limitations period, damages for recovery are limited by the statutory period."  *Id.* (citing *Chevron U.S.A. Inc. v. Apex Oil Co.*, 113 F. Supp. 3d 807, 820 (D. Md. 2015)).

The Court finds that Plaintiff Andrews' pre-October 2019 claims are subject to the continuing harm doctrine.  The Fourth Circuit has made clear that "a prisoner may allege a continuing violation under Section 1983 by identifying a series of acts or omissions that demonstrate deliberate indifference to a serious, ongoing medical need."  *DePaola v. Clarke*, 884 F.3d 481, 487 (4th Cir. 2018).  "Accordingly, to assert a Section 1983 claim for deliberate indifference under the 'continuing violation' doctrine, a plaintiff must (1) identify a series of acts or omissions that demonstrate deliberate indifference to his serious medical need(s); and (2) place one or more of these acts or omissions within the applicable statute of limitations for personal injury."  *Id.*  Count III of Plaintiffs' Complaint asserts a cause of action for deliberate indifference under 42 U.S.C. § 1983, which Defendants do not challenge the sufficiency of, substantively. (ECF No. 2 at 33).  Plaintiff Andrews also alleges a series of acts or omissions that plausibly demonstrate Defendants' deliberate indifference to his medical needs.  For instance, Mr. Andrews identifies various acts of deliberate indifference toward the accommodations he allegedly required because of his foot ulcer.  These include Defendants failing to provide Mr. Andrews with a wheelchair upon his arrival at DRCF in January 2019 despite his medical order for a wheelchair because he was not supposed to walk on his ulcerated foot; DPSCS improperly providing Mr.

Andrews with a walking boot after his first amputation; and DPSCS failing to promptly provide

Mr. Andrews with a wheelchair following his second amputation.  Notably, Mr. Andrews also

alleges that DPSCS failed to provide Mr. Andrews with a prosthetic in response to these issues

"until early 2020," which would fall within the applicable three-year statute of limitations.  All the

above allegations stem from Plaintiff Andrews' general assertion that Defendants exhibited

deliberate indifference to Mr. Andrews' medical needs regarding his foot ulcer, some of which

occurred after October 21, 2019.  *See Carter v. Pa. Dep't of Corrs.*, No. CIV A 08-0279, 2008 WL

5250433, at *10 (E.D. Pa. Dec. 17, 2008) ("[T]he facts in this case support a continuing violation.

The violations are of the same type of discrimination which is denying and delaying plaintiff's

treatment for the same tumor in his spine.  The only change alleged is that due to the denial and

delay plaintiff required more intense treatment than before . . . The acts [also] recurred with

frequency as evidenced by plaintiff's numerous grievances and alleged ongoing and repeated

denial and delay of several treatments for the tumor."); *Goulette v. Wilson*, No. 5:17-CT-03036-

D, 2019 WL 1006256, at *2–3 (E.D.N.C. Feb. 4, 2019), *report and recommendation adopted*, No.

5:17-CT-3036-D, 2019 WL 1003634 (E.D.N.C. Feb. 28, 2019) ("The statute of limitations does

not begin to run on [a claim subject to the continuing violation doctrine] until the date when the

inmate received adequate treatment."); *see also Hall v. Stouffer*, No. CV GLR-15-1008, 2018 WL

8335491, at *11 (D. Md. Sept. 25, 2018) (applying continuing violation doctrine where plaintiff's

civil rights claims were "not readily divisible into separate lawsuits" given plaintiff's "ongoing

injuries").  Defendants' Motion is thus denied with respect to this issue, although the Court

acknowledges that Plaintiff Andrews' damages are nevertheless "limited to those occurring within

the three year period prior to the filing of the action."  *Chevron*, 113 F. Supp. 3d at 820 (internal

quotation omitted).

B. The Court Will Reserve Ruling on Whether Defendants Enjoy Sovereign Immunity
Regarding Plaintiffs' ADA Claims

Defendants next argue that sovereign immunity shields both DPSCS and the individual

Defendants from liability under Plaintiffs' ADA claims in Count I.  (ECF No. 40-1 at 16).  Given

Plaintiffs' clarification that Count I is being asserted against DPSCS only, Defendants' argument

regarding the individual Defendants' potential liability thereunder is denied as moot.  Turning to

the merits of Defendants' argument, the Eleventh Amendment to the United States Constitution

provides that "The Judicial power of the United States shall not be construed to extend to any suit

in law or equity, commenced or prosecuted against one of the United States by Citizens of another

State, or by Citizens or Subjects of any Foreign State."  "Although by its terms the Amendment

applies only to suits against a State by citizens of another State," the Supreme Court has "extended

the Amendment's applicability to suits by citizens against their own States."  *Bd. of Trustees of*

*Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).  "The ultimate guarantee of the Eleventh

Amendment is that nonconsenting States may not be sued by private individuals in federal court."

*Id.*  "In other words, under the Eleventh Amendment, a private individual is barred from bringing

a suit against a state in federal court to recover damages, unless the state consents or there is an

exception to sovereign immunity."  *Haughie v. Wexford Health Sources, Inc.*, No. CV ELH-18-

3963, 2019 WL 6467859, at *1 (D. Md. Dec. 2, 2019).  "In addition, absent waiver or a valid

congressional abrogation of sovereign immunity, sovereign immunity also bars suit against an

instrumentality of a state, sometimes referred to as an 'arm of the state.'"  *Id.* at *2 (quoting

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984)).  The Fourth Circuit

has identified three exceptions to the Eleventh Amendment's prohibition of suits against an arm

of the state: (1) when Congress "both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority"; (2) "suits for prospective injunctive relief against state officials acting in violation of federal law"; and (3) when a State waives its Eleventh Amendment immunity from suit in a federal court. *Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 249 (4th Cir. 2012).

DPSCS is an arm of the state. *See Haughie*, 2019 WL 6467859 at *2 ("The DPSCS is an arm of the state."); *Clarke v. Md. Dep't of Pub. Safety and Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009) ("[T]he Maryland Department of Public Safety and Correctional Services is undoubtedly an arm of the state."); Md. Code Ann., Corr. Servs. § 2-101 ("There is a Department of Public Safety and Correctional Services established as a principal department of the State government."). Plaintiffs seek monetary damages only for all Counts and therefore the second exception to sovereign immunity does not apply. *See* (ECF No. 2 at 29 ¶ 116, 33 ¶ 133, 34 ¶ 140, 35 ¶ 150). Nor do Plaintiffs oppose Defendants' assertion that Defendants have not waived their sovereign immunity with respect to Plaintiffs' ADA claims when removing the case to federal court.[3] That leaves only the first exception for analysis.

---

[3] Although the parties do not contest the issue of waiver by removal, the Fourth Circuit has previously analyzed in light of similar arguments whether a defendant waives its sovereign immunity by removing a case from state to federal court. In *Lapides v. Board of Regents*, the Supreme Court held that "a removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter (here of state law) in a federal forum." 535 U.S. 613, 624 (2000). But "the Court in *Lapides* did not resolve the effect, if any, of a state's voluntary decision to remove an action from which it would have been immune in its own courts." *Stewart v. North Carolina*, 393 F.3d 484, 488–89 (4th Cir. 2005). And since identifying this distinction, the Fourth Circuit has held that "[i]n this circuit, a state's removal of a suit to federal court waives sovereign immunity only if the state has consented to suit in its own courts." *Biggs v. N.C. Dep't of Pub. Safety*, 953 F.3d 236, 241 (4th Cir. 2020). This Court has adopted this reasoning in the context of Eleventh Amendment immunity. *See Bozarth v. Md. State Dep't of Educ.*, No. DLB-19-3615, 2021 WL 1225448, at *10 (D. Md. Mar. 31, 2021) (noting that "the Fourth Circuit's reasoning in *Stewart* suggests that, in a case where the State has not waived its common law immunity in its own courts, it should not waive its Eleventh Amendment immunity by removing the case to federal court"). Further, this Court has remarked that there is no applicable authority "concluding that the State has waived its sovereign immunity as to ADA claims brought in Maryland courts." *Squire v. Md. Transit Admin.*, No. 1:22-CV-02493-JRR, 2023 WL 4593373, at *9 (D. Md. July 18, 2023). Plaintiffs do not argue that Defendants waived their sovereign immunity in

Plaintiffs' claims under the ADA are brought pursuant to Titles II and V thereunder. "Title II of the ADA prohibits public entities, including 'any State or local government' and 'any department, agency, special purpose district, or other instrumentality of a State or States or local government,' from discriminating 'by reason of' disability against a 'qualified individual with a disability.'" *Fenicle v. Towson Univ.*, No. CV ELH-18-0917, 2018 WL 5885526, at \*6 (D. Md. Nov. 8, 2018) (quoting 42 U.S.C. §§ 12131(1), 12132).  "Title V includes provisions against retaliation," namely that "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *Id.* at \*5; 42 U.S.C. § 12203(a); *see also Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004) ("[The ADA] forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I[]; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III.").

Regarding Title II, the Fourth Circuit held in *Wessel v. Glendening* that "Congress did not validly abrogate the sovereign immunity of the states when it enacted . . . Title II of the ADA." 306 F.3d 203, 215 (2002); *see also Biggs v. Bd. of Educ. of Cecil Cnty., Md.*, 229 F. Supp. 2d 437, 443 (D. Md. 2002) ("Congress did not validly abrogate the States' Eleventh Amendment immunity in Title II of the ADA, and the State may not be sued for monetary damages under Title II.").  But

---

state court regarding Plaintiffs' ADA claims and thus waived their sovereign immunity by removing this case to federal court; nor do Plaintiffs oppose Defendants' assertions that they have not waived their sovereign immunity regarding Plaintiffs' ADA claims either at the state level or by removing this case.  *See* (ECF No. 40-1 at 18–20). Accordingly, the Court finds that Defendants' sovereign immunity has not been waived for Plaintiffs' ADA claims by virtue of Defendants' removal.

after noting that the express language of the ADA called for abrogation of state sovereign immunity, and finding that Title II was enacted pursuant to a valid exercise of congressional power, the Supreme Court concluded in *Tennesee v. Lane* that Title II *did* abrogate states' sovereign immunity in "the class of cases implicating the fundamental right of access to the courts." 541 U.S. at 533–34. The Supreme Court then clarified in *United States v. Georgia* that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." 546 U.S. 151, 159 (2006) (emphasis in original). The *Georgia* Court also provided guidance to lower courts in determining whether the Eleventh Amendment bars an ADA Title II claim in the form of a three-part test that requires identifying: "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.*

Although the parties contest whether Defendants' sovereign immunity has been abrogated for Plaintiff's ADA claims, the Court need not decide this issue at the pleading stage. The Fourth Circuit has made clear that "state agencies that knowingly and willingly accept clearly conditioned federal funding validly waive their Eleventh Amendment immunity with respect to claims for damages under § 504 of the Rehabilitation Act." *Spencer v. Earley*, 278 F. App'x 254, 259 n.4 (4th Cir. 2008); *see also* 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment . . . from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 . . . or the provisions of any other Federal statute prohibiting

discrimination by recipients of Federal financial assistance."). Plaintiffs allege, and Defendants do not contest, that DPSCS is a state agency which receives federal funding to maintain its operations. *See* (ECF No. 2 at ¶¶ 16, 121).[4] Thus, Plaintiffs' claims under § 504 of the Rehabilitation Act are not barred by the Eleventh Amendment. And because sovereign immunity does not bar Plaintiffs' Rehabilitation Act claims, the court has subject matter jurisdiction over this action regardless of Defendants' immunity from Plaintiffs' ADA claims. In fact, the Rehabilitation Act expressly provides that the remedies available to a plaintiff under Title II of the ADA and the Rehabilitation Act are identical. *See* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [the ADA] shall be the remedies, procedures, and rights this subchapter provides to any person alleging discrimination on the basis of disability in violation of section 12132 of this title."). Thus, "as a practical matter, this case will proceed on the same course regardless of whether [Defendants] may later be found immune from Plaintiff[s'] ADA claim." *Ross v. City of N.Y.*, 211 F. Supp. 3d 518, 528 (E.D.N.Y. 2016); *see also Fink v. Richmond*, No. CIV.A. DKC 2007-0714, 2008 WL 9364730, at *8 (D. Md. Mar. 24, 2008) ("[G]iven the uncertainty on the issue and the fact that the case will proceed under the [Rehabilitation Act] in any event, final determination whether a valid ADA Title II claim exists need not be made now."); *Ash v. Md. Transit Admin.*, No. CV ELH-18-1216, 2019 WL 1129439, at *13 (D. Md. Mar. 12, 2019) (denying ADA Title II sovereign immunity argument at motion to dismiss stage because the case would nevertheless proceed under the Rehabilitation Act); *Beckhorn v. N.Y. State Dep't of*

---

[4] In fact, the State of Maryland maintains several public fiscal records which readily indicate that DPSCS does receive federal funding. *See, e.g.*, *Dep't of Pub. Safety and Corr. Servs. Budget*, MD. MANUAL ON-LINE, https://msa.maryland.gov/msa/mdmanual/22dpscs/html/dpscsb.html (last visited February 6, 2024); *see also Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023) ("[A] court may properly take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.") (citing *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

*Corr. & Cmty. Supervision*, No. 18-CV-01452-LJV-JJM, 2019 WL 5598337, at *4 (W.D.N.Y. Oct. 10, 2019), *report and recommendation adopted*, No. 18-CV-1452, 2019 WL 5589038 (W.D.N.Y. Oct. 30, 2019) (same); *Gaylor v. Ga. Dep't of Nat. Res.*, No. 2:11-CV-288-RWS, 2013 WL 4790158, at *3–4 (N.D. Ga. Sept. 6, 2013) ("[T]he Court has held that Plaintiff's claims under § 504 may proceed based on the allegation that Defendants waived their Eleventh Amendment immunity by accepting federal financial assistance . . . Therefore, unless and until Defendants present evidence establishing that the programs alleged to violate § 504 have not received federal financial assistance, the Court need not address the issue of abrogation under Title II of the ADA.").[5] Defendants' Motion to dismiss Plaintiffs' ADA claims on sovereign immunity grounds is therefore denied without prejudice to Defendants to renew their argument at a later date.

    C.  <u>Any Claims Against the Individual Defendants Under Counts I and II Are Dismissed</u>

    Defendants further argue that the individual Defendants, in both their individual and official capacities, are entitled to dismissal of Plaintiffs' ADA claims in Count I and Rehabilitation Act claims in Count II.  (ECF No. 40-1 at 27).  Plaintiffs do not contest that the individual Defendants may not be sued under the ADA or Rehabilitation Act.  Nor can they.  "Title II of the ADA does not recognize a cause of action for discrimination by private individuals, only public entities."  *Pathways Psychosocial v. Town of Leonardtown, Md.*, 133 F. Supp. 2d 772, 780 (D. Md. 2001); *see also Lewis v. Bd. of Educ. of Kent Cnty.*, No. JFM 07-955, 2007 WL 2343659, at *1 (D. Md. Aug. 14, 2007) ("The motion to dismiss filed by the individual defendants will be granted because . . . there is no individual liability under the ADA.").  Similarly, "individuals are

---

[5] To be clear, Defendants do not argue for dismissal of the entirety of Plaintiffs' § 504 Rehabilitation Act claim. Rather, Defendants' only argument regarding Count II in their Partial Motion to Dismiss is that the individual Defendants are entitled to dismissal because the Rehabilitation Act does not authorize actions against individuals, discussed further *infra*.

not subject to liability under Section 504 [of the Rehabilitation Act]." *Lewis*, 2007 WL 2343659 at *1; *Polido v. Crowley*, No. 8:23-CV-00459-PX, 2024 WL 263578, at *3 (D. Md. Jan. 24, 2024) ("It is plain that [the ADA and Rehabilitation Act] prohibit public entities, including any State government or instrumentality of the State, from discriminating against a qualified individual with a disability . . . But the statutes do not cover individual capacity suits."). Plaintiffs concede as much in their Opposition by clarifying that Counts I and II are being asserted against DPSCS only. *See* (ECF No. 47 at 1). Defendant's Motion is therefore granted with prejudice to the extent that Plaintiffs may not plausibly allege a violation of the ADA (Count I) or Rehabilitation Act (Count II) against any of the individual Defendants.

   D.   Any Claims Against DPSCS and the Individual Defendants in their Official
        Capacities Under 42 U.S.C. § 1983 Are Dismissed

   Defendants next contend that Count III under 42 U.S.C. § 1983 cannot proceed against DPSCS or the individual Defendants in the official capacity because DPSCS is not a "person" for purposes of § 1983 and because § 1983 does not permit suits against individuals in their official capacity. (ECF No. 40-1 at 25–26). Regarding DPSCS, Defendants are correct that "A state agency . . . cannot be sued under § 1983 because a state agency is not a 'person' under 42 U.S.C. § 1983." *Lilly v. Balt. Police Dep't*, No. CV RDB-22-2752, 2023 WL 6216605, at *8 (D. Md. Sept. 25, 2023); *Chin v. City of Balt.*, 241 F. Supp. 2d 546, 548 (D. Md. 2003) ("With respect to the § 1983 claim . . . a state agency is not a 'person' as the term is used in 42 U.S.C. § 1983. For that reason, a state agency cannot be sued under § 1983."). There is also significant caselaw from this Court confirming that "individual defendants in their official capacities cannot be sued under 42 U.S.C. § 1983 because they are not 'persons' within the meaning of that section." *Lewis*, 2007 WL 2343659 at *1; *see also Does 1-22 v. Bd. of Educ. of Prince George's Cnty.*, 644 F. Supp. 3d

149, 158 (D. Md. 2022) ("A state is not a 'person' within the meaning of § 1983 and is therefore not a proper defendant in a § 1983 case.  In turn, because an official capacity suit against a government official is no different from a suit against the State itself, the claims against the individual Defendants in their official capacities are likewise not claims against a 'person' under § 1983 and therefore must be dismissed.") (internal quotation omitted).  Similar to the prior argument, Plaintiffs note in their Opposition that Count III under § 1983 is being asserted against Defendants "Acuff and Campbell, individually," and alleges that Defendants Acuff and Campbell are subject to liability under § 1983 "in their individual capacities."  (ECF No. 47 at 1, 13).  Defendants' Motion is therefore also granted with prejudice to the extent that Plaintiffs may not plausibly allege violations of 42 U.S.C. § 1983 (Count III) against DPSCS or any of the individual Defendants in their official capacities.

     E.   <u>Plaintiffs Plausibly Allege State Law Violations in Counts IV and V for Which Defendants Are Not Entitled to Governmental Immunity</u>

        *1.   Plaintiffs' Claims Are Not Barred by Their Failure to Plead Compliance with the Maryland Tort Claims Act ("MTCA")*

Defendants raise various arguments seeking dismissal of Counts IV and V, which the Court will analyze one by one.  One such argument is that Counts IV and V fail to state a plausible claim because Plaintiffs "failed to plead satisfaction of the MTCA notice requirement for any of the claims brought by either Plaintiff."  (ECF No. 40-1 at 32).  "Under the MTCA, '[a] plaintiff may assert a common law or state constitutional tort claim against the State of Maryland or one of its agencies only if he first complies with the notice requirements of the [statute], which provides a limited waiver of sovereign immunity.'"  *Canter v. Mamboob*, No. GJH-17-908, 2020 WL 1331894, at *17 (D. Md. Mar. 23, 2020) (quoting *Taylor v. Somerset Cnty. Comm'rs*, No. RDB-

16-0338, 2016 WL 3906641, at *5 (D. Md. July 19, 2016)).  "Specifically, a plaintiff must provide written notice to the State Treasurer or its designees within one year of the alleged injury." *McDaniel v. Maryland*, No. CIV.A. RDB-10-00189, 2010 WL 3260007, at *3 (D. Md. Aug. 18, 2010); *see also* Md. Code Ann., State Gov't § 12-106(b) (requiring that (1) a plaintiff submit a written claim to the Treasurer within 1 year of the injury; (2) the Treasurer denies the claim; and (3) the plaintiff's action be filed within 3 years after the cause of action arises).  Historically, "The MTCA's notice requirements [were] strictly enforced and courts [could] not entertain claims by claimants who fail to exhaust their administrative remedies before the Treasurer."  *McDaniel*, 2010 WL 3260007 at *3 (internal quotation omitted).  But this Court has recognized two corollary principles softening strict compliance with the MTCA's notice provisions.  First, "the Maryland General Assembly amended the MTCA in 2015 to permit substantial compliance . . . [which] entails a communication that provides the State requisite and timely notice of facts and circumstances giving rise to the claim." *Id.*[6]  Second, the MTCA's notice requirement is not a prerequisite to filing suit where a plaintiff's complaint "*sufficiently* allege[s] malice or gross negligence." *Pope v. Barbre*, 402 Md. 157, 181–82 (2007) (emphasis in original); *see also Francis v. Maryland*, No. CV ELH-21-1365, 2023 WL 2456553, at *26 (D. Md. Mar. 10, 2023) ("Thus, compliance with the MTCA's notice requirement is not necessary in a suit against individual State personnel in which it is sufficiently alleged that the defendants acted with malice or gross negligence."); *Jordan v. Davis*, No. CV ELH-22-1541, 2023 WL 2478862, at *23 (D. Md. Mar.

---

[6] Specifically, the MTCA provides that "If a claimant fails to submit a written claim . . . on motion by a claimant and for good cause shown, the court may entertain an action under this subtitle unless the State can affirmatively show that its defense has been prejudiced by the claimant's failure to submit the claim."  Md. Code Ann., State Gov't § 12-106(c)(1).  Moreover, the notice provisions "do not apply if, within 1 year after the injury to person or property that is basis of the claim, the State has actual or constructive notice of: (i) the claimant's injury; or (ii) the defect or circumstances giving rise to the claimant's injury."  *Id.* § 12-106(c)(2).

13, 2023) ("[T]he same standards of malice and gross negligence govern State common law torts and violations of State constitutional rights.") (internal quotation omitted).

Plaintiffs' rebuttal on this point highlights their failure to sufficiently plead compliance with the MTCA. Plaintiffs' Complaint does not allege any compliance whatsoever with the MTCA's notice requirements or indicate that the Secretary (or its designee(s)) was provided with a written notice regarding Plaintiffs' claims at any point in time. Nor does the Complaint charge the State with actual or constructive notice of Plaintiffs' claims or any defect or circumstances giving rise to Plaintiffs' injuries. Plaintiffs' Opposition merely asserts in conclusory fashion that "the State has in real-time 'actual or constructive notice of [Andrew's] injury and the 'defect or circumstances giving rise' to that injury. Mr. Andrews might have sent in a formal notice of claim had DPSCS personnel not threatened to punish him if he continued to grieve about his inadequate conditions of confinement." (ECF No. 47 at 25).

Nor have Plaintiffs sufficiently alleged malice. Plaintiffs' state law claims expressly allege that "each Defendant was acting under the color of state law" and that "their acts and/or omissions were conducted within the scope of their official duties or employment." (ECF No. 2 at 34). Thus, Plaintiffs' failure to plead compliance with the MTCA's notice provisions may be saved only if Plaintiffs' sufficiently allege malice or gross negligence. "In Maryland, malice is 'conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Taylor*, 2016 WL 3906641 at *6 (quoting *Lee v. Cline*, 384 Md. 245, 268 (2004)). "A state official thus must 'actually and subjectively intend to do wrong or harm' to act with malice." *Id.* (quoting *Marks v. Dann*, 600 F. App'x 81, 86 (4th Cir. 2015)). Plaintiffs do not allege that any Defendants actually and subjectively intended to do them wrong or harm, and Plaintiffs

have therefore failed to sufficiently plead malice sufficient to overcome the MTCA's notice requirements.

The Complaint does sufficiently allege gross negligence, however. "Under Maryland law, gross negligence is 'an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them.'" *Id.* (quoting *Barbre*, 402 Md. at 187). Plaintiffs' Complaint is replete with allegations that Defendants—especially Defendants Acuff and Campbell—owed Plaintiffs and other inmates a duty to ensure that they received proper medical care, knew that Plaintiffs and other inmates were not receiving adequate medical care and treatment (including through Plaintiffs' numerous grievances), and nonetheless disregarded that knowledge leading to various new injuries and the exacerbation of existing injuries. *See, e.g.*, (ECF No. 2 at ¶¶ 3–5, 7–8, 21–22, 41–44, 46–47, 52–53, 56–57, 59–62, 76–80, 101, 108, 110, 114, 135–138). "At this early stage, such allegations are sufficient to raise a plausible inference that [Defendants] thoughtlessly disregarded the consequences of [their] failure to ensure that [Plaintiffs] received adequate medical care" and living conditions. *Taylor*, 2016 WL 3906641 at *6; *see also id.* (denying motion to dismiss brought by defendant prison warden for failure to abide by MTCA notice provisions where plaintiff sufficiently alleged gross negligence in the provision of medical care). Plaintiffs' state law claims are therefore not precluded by governmental immunity and are not subject to dismissal for failing to abide by (or plausibly allege compliance with) the MTCA.

2.  *Defendants Are Not Entitled to Immunity Regarding Counts IV and V*

Finally, Defendants argue that (1) they are *all* entitled to dismissal of Count IV to the extent it asserts violations of Article 16 of the Maryland Declaration of Rights; and (2) DPSCS and the "Official Capacity Defendants" are entitled to dismissal of the Article 25 claim in Count IV because they are immune from suit thereunder.  (ECF No. 40-1 at 26, 30).  Defendants relatedly argue that Ms. Acuff and Mr. Campbell are entitled to dismissal of Counts IV and V against them "because they enjoy the governmental immunity bestowed upon them by the MTCA."  *Id.* at 30. Although Plaintiffs do not specifically oppose Defendants' first argument regarding Article 16, the Court finds that argument to be unpersuasive.  Defendants' argument on this issue consists of identifying Article 16's origins, defining the term "sanguinary laws" as used therein, and concluding that Defendants are entitled to dismissal of the Article 16 claim because "Plaintiffs have not challenged the offenses for which they were convicted or the sentences imposed."  *Id.* at 31.  But Defendants provide no support—and the Court has found none on its own—for the proposition that a plaintiff may allege a violation of Article 16 only by challenging the offenses for which they were convicted or the sentences imposed on them.  Rather, there are numerous instances in which this Court has permitted plaintiffs' Article 16 claims to proceed without the plaintiff doing so, particularly where a plaintiff alleges violations of both Articles 16 and 25.  *See, e.g.*, *Younger v. Maryland*, No. CV RDB-16-3269, 2017 WL 3608184 (D. Md. Aug. 22, 2017); *Gough v. Semexan*, No. CV BPG-21-14, 2022 WL 2073855 (D. Md. June 9, 2022); *Palmont v. Wright*, No. 19-CV-0568-PWG, 2020 WL 7043850 (D. Md. Dec. 1, 2020).  Moreover, the Supreme Court has indicated that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.  In its prohibition

25

of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials . . . who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotations omitted).  Reading such a scope *in pari materia* with Plaintiffs' Article 16 and 26 claims would thus lead to the conclusion that Article 16 also applies to the treatment of prisoners after criminal convictions rather than being solely applicable to prisoners challenging their underlying convictions and/or sentences. *See Gough*, 2022 WL 2073855 at \*6 ("Articles 16 and 25, therefore, are interpreted *in pari materia* with the Eighth Amendment.  Thus, any analysis as to the Eighth Amendment is equally applicable to [plaintiff's] claims under [Articles 16 and 25 of] the Maryland Declaration of Rights.") (internal quotation omitted).

Regarding Defendants' Article 25 and governmental immunity arguments, the MTCA provides that "the immunity of the State and of its units is waived as to a tort action, in a Court of the State," subject to certain limitations on liability caps.  Md. Code Ann., State Gov't § 12-104.  The MTCA further provides that "State personnel shall have the immunity from liability described under § 5-522(b) of the Courts and Judicial Proceedings Article."  Md. Code Ann., State Gov't § 12-105.  Section 5-522(b), in turn, provides that state personnel are immune from tortious liability for acts performed within the scope of their duties and without malice or gross negligence.  Md. Code Ann., Cts. & Jud. Proc. §5-522(b).   "This immunity applies to constitutional torts and intentional torts." *Stutzman v. Krenik*, 350 F. Supp. 3d 366, 387 (D. Md. 2018).  But "neither this statute nor common law provides immunity to Maryland state personnel for claims of gross negligence." *Id.*; *see also McDaniel v. Arnold*, 898 F. Supp. 2d 809, 849 (D. Md. 2012) ("The

MTCA does not distinguish between constitutional torts and common law torts.  Accordingly, the same standards of malice and gross negligence govern state common-law tort claims and violations of state constitutional rights.").  The Court found for the reasons explained above that Plaintiffs have sufficiently pled that Defendants acted with gross negligence, and therefore Defendants are not entitled to immunity under the MTCA for Plaintiffs' state law claims.  And because Defendants are not entitled to immunity from Plaintiffs' state law claims in Maryland courts, they are likewise not entitled to sovereign immunity in this Court for Plaintiffs' state law claims.  *See Biggs*, 953 F.3d at 241 ("In this circuit, a state's removal of a suit to federal court waives sovereign immunity only if the state has consented to suit in its own courts."); (ECF No. 40-1 at 29) ("The MTCA is the State of Maryland's limited and conditional waiver of its sovereign immunity in State court, and applies to the Department, as a sub-unit of the State, and to the individual Defendants to the extent they did not act with malice or gross negligence.").  Defendants' Motion is therefore denied to the extent it seeks dismissal of the Article 16 and 25 claims in Count IV.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion (ECF No. 40), construed as a motion to dismiss, is granted in part and denied in part.  A separate Order follows.

Date: <u>February 9, 2024</u>                              <u>              /s/              </u>
                                                        J. Mark Coulson
                                                        United States Magistrate Judge